# EXHIBIT 6

*HERAEUS KULZER LLC VS.*
*OMNI DENTAL SUPPLY*

*GEORGE ROMERO*
*March 19, 2013*



**Ellen Grauer**
**COURT REPORTING** Co. LLC

126 East 56th Street, Fifth Floor New York, New York 10022
PHONE: (212) 750-6434   FAX: (212) 750-1097
www.ELLENGRAUER.com

*Original File 103231B.TXT*
*Min-U-Script® with Word Index*

**HERAEUS KULZER LLC VS.**
**OMNI DENTAL SUPPLY**

**GEORGE ROMERO**
**March 19, 2013**

---

Page 1

```
 1  UNITED STATES DISTRICT COURT
 2  DISTRICT OF MASSACHUSETTS
 3  -----------------------------------x
    HERAEUS KULZER LLC,
 4                    Plaintiff,
 5    -against-
 6  OMNI DENTAL SUPPLY,
 7                    Defendant.
 8  Case No. 1:12-cv-11099-RGS
 9  -----------------------------------x
10                    1180 Ave. of the Americas
                      New York, New York
11
                      March 19, 2013
12                    1:03 p.m.
13
14           DEPOSITION of GEORGE ROMERO, taken
15  before Marianne Witkowski-Smith, CSR, a Notary
16  Public of the State of New York.
17
18
19
20
21
22
23       ELLEN GRAUER COURT REPORTING CO. LLC
24        126 East 56th Street, Fifth Floor
            New York, New York 10022
              212-750-6434
25             REF: 103231B
```

---

Page 2

```
 1  A P P E A R A N C E S:
 2
 3  NELSON, MULLINS, RILEY & SCARBOROUGH, L.L.P.
 4  Attorneys for Plaintiff.
 5      One Post Office Square, Floor 30
 6      Boston, Massachusetts  02109
 7  BY:  JEFFREY S. PATTERSON, ESQ.
 8       MORGAN T. NICKERSON, ESQ.
 9       PHONE:  617-573-4705
10       E-MAIL: jeffrey.patterson@nelsonmullins.com
11
12
13  OSTROLENK FABER, L.L.P.
14  Attorneys for Defendant.
15      1180 Avenue of the Americas
16      New York, New York  10036
17  BY:  MAX MOSKOWITZ, ESQ.
18       PHONE:  212-382-0700
19       E-MAIL: mmoskowitz@ostrolenk.com.
20
21
22  ALSO PRESENT:
23  MARK LANDAU
24  AUSTIN SO, ESQ. - Via Telephone
25
```

---

Page 3

```
 1  ---------------- I N D E X ----------------
 2  WITNESS              EXAMINATION BY       PAGE
 3  GEORGE H. ROMERO     MR. MOSKOWITZ          6
 4
 5
 6  -------- INFORMATION/DOCUMENTS REQUESTED --------
 7  PAGE:    157   Full identification/Austin So, Esq.
 8
 9
10  ---------------- E X H I B I T S ----------------
11  ROMERO               DESCRIPTION        FOR I.D.
12  Exhibit 1    Deposition Notice              8
13  Exhibit 2    First Amended Complaint        8
14  Exhibit 3    Indiana Secretary of          27
                 State, Document
15
16  Exhibit 4    Heraeus Dental North          29
                 America, document
17  Exhibit 5    Document identifying Dr.       31
                 Martin Haase
18
19  Exhibit 6    Heraeus Kulzer GmbH           34
                 Dental Manufacturer
20  Exhibit 7    Heraeus Kulzer Locations,     37
                 Document
21
22  Exhibit 8    Heraeus Holding GmbH,         39
                 Document
23  Exhibit 9    Internet document             41
                 Referencing Heraeus
24               Patents
25  Exhibit 10   Wikipedia document            42
```

---

Page 4

```
 1  --------- E X H I B I T S (Cont'd) ---------
 2  ROMERO               DESCRIPTION        FOR I.D.
 3  Exhibit 11   Document referencing          43
                 usa.heraeus.jobs
 4
 5  Exhibit 12   Heraeus Kulzer Dental         50
                 Division document
 6  Exhibit 13   Document referencing          54
                 Company history
 7
 8  Exhibit 14   Document referencing          55
                 George Romero/Heraeus
                 Holding GmbH
 9
10  Exhibit 15   Document referencing          56
                 Venus product
11  Exhibit 16   Heraeus Holding GmbH          58
                 Document
12
13  Exhibit 17   Heraeus Recycling             62
                 Technology document
14  Exhibit 18   Photocopy of product boxes    64
15  Exhibit 19   United States Trademark       65
                 Office documents
16
17  Exhibit 20   United States Trademark       68
                 Office documents
18  Exhibit 21   Photo of product boxes        76
19  Exhibit 22   Photocopy referencing         82
                 GLUMA description/box
20
21  Exhibit 23   Photocopy referencing         84
                 CHARISMA description
22  Exhibit 24   Photocopy referencing         85
                 iBOND description
23
24  Exhibit 25   Document referencing          86
                 Customer service center
25
```

---

Page 5

```
 1   ------------ E X H I B I T S  (Cont'd) -----------
 2   ROMERO        DESCRIPTION                  FOR I.D.
 3   Exhibit 26    Internet dictionary             87
                   Definitions
 4
 5   Exhibit 27    Merriam Webster gray-market      99
                   Definition
 6   Exhibit 28    E-mail string beginning         109
                   with John Sargent
 7
 8   Exhibit 29    E-mail string beginning         112
                   3/9/10
 9   Exhibit 30    Letter to Omni Dental           115
                   Supply Bates OD001053
10
11   Exhibit 31    E-mail string beginning         118
                   11/1/10
12   Exhibit 32    E-mail string beginning         120
                   10/23/07
13
14   Exhibit 33    E-mail string beginning         123
                   2/15/12
15   Exhibit 34    E-mail string beginning         125
                   with Ronnie Klein
16
17   Exhibit 35    Documents Bates HER 18-21       126
18   Exhibit 36    Documents Bates HER 22-26       131
19   Exhibit 37    E-mail string beginning         134
                   with Customer Service HKNA
20   Exhibit 38    Documents Bates HER 29-37       135
21   Exhibit 39    5/25/11 press release           145
22
23            (EXHIBITS RETAINED BY MR. MOSKOWITZ)
24
25
```

Page 6

1   P R O C E E D I N G S
2
3   G E O R G E  R O M E R O, called as a witness,
4   having first been duly sworn by the Notary
5   Public, was examined and testified as
6   follows:
7
8   EXAMINATION BY
9     MR. MOSKOWITZ:
10  Q. Good afternoon, Mr. -- why don't you
11  state your name and city and state for the record.
12  A. My name is George Romero; I live in Long
13  Island, New York.
14  Q. Okay. That's okay, not far from here.
15  Very good.
16  Have you had your deposition taken on
17  any prior occasion?
18  A. Never.
19  Q. Okay. So just by way of introduction,
20  I'll be posing questions to you, and I will ask
21  that in each instance you wait for my question to
22  be completed, give a second to your attorney in
23  case he wants to voice an objection.
24  A. Okay.
25  Q. If you hear the attorneys talking to one

Page 7

1     ROMERO
2   another, wait until the discussion is over. But
3   once that has gone by, answer the question that I
4   ask unless your attorney tells you not to answer.
5   A. Okay.
6   Q. Okay. That's acceptable?
7   A. That's clear.
8   Q. Okay, that's clear.
9   Have you done anything to prepare for
10  this deposition? Did you look at any documents?
11  A. Yes.
12  Q. Can you describe to me the type of
13  documents you looked at?
14  A. I looked at the documents that -- that
15  were available through this proceeding, the same
16  thing that you have.
17  Q. Okay. Documents produced by Heraeus?
18  A. There's a package that came in a PDF --
19  Q. Yes.
20  A. -- that has all the documents presented
21  for this case.
22  That's what I've reviewed.
23  Q. Okay. Did you see documents that came
24  from Omni Dental, my client?
25  A. No, no, I saw -- the only time that Omni

Page 8

1     ROMERO
2   Dental shows up in that PDF is documents that we
3   produced; meaning flyers, things of that nature.
4   Q. Okay. Did you discuss this deposition
5   with anyone other than attorneys?
6   A. No.
7     MR. MOSKOWITZ: Okay. I will mark
8   as Defendant's Exhibit 1 your Notice of
9   Deposition and merely state that this is a
10  legal document pursuant to which you are here
11  today. I'm not going to ask you any
12  questions about it, okay?
13    THE WITNESS: Okay.
14    (DEFENDANT EXHIBIT 1, Deposition
15  Notice, marked for identification.)
16    MR. MOSKOWITZ: Then I'm going to
17  mark as Defendant's Exhibit 2 the first
18  amended complaint in the lawsuit, which is
19  captioned Heraeus Kulzer LLC, Plaintiff,
20  against Omni Dental Supply, Defendant.
21    (DEFENDANT EXHIBIT 2, First amended
22  complaint, marked for identification.)
23    BY MR. MOSKOWITZ:
24  Q. Okay. Now, have you ever seen a
25  complaint that was filed in this lawsuit?

Page 13

ROMERO

2 those people?
3 **A.  I met Julia Heraeus on a visit to the**
4 **United States.**
5 Q.  Okay.  She was visiting here, right?
6 **A.  Yes.**
7 Q.  Okay.  Where was that meeting you had
8 with her?
9 **A.  I didn't have a meeting with her.**
10 Q.  Where did you see her?
11 **A.  I saw her at the -- at the office in**
12 **Armonk, New York.**
13 Q.  You said at the office in Armonk, New
14 York.  Whose office?
15 **A.  Heraeus Kulzer LLC.**
16 Q.  Okay.  Did you ever travel to Germany to
17 any company -- and visit any company named
18 Heraeus?
19 **A.  I have.**
20 Q.  Where did you visit?
21 **A.  I visited Hanau.**
22 Q.  H-A-N-A-U.
23 Who is located at -- which company is
24 located at Hanau?
25 **A.  Heraeus -- Heraeus.**

Page 14

ROMERO

2 Q.  Again you used the term "Heraeus."  Does
3 the term "Heraeus" mean to you one particular
4 company or a number of companies, or what?
5 **A.  Heraeus the German company.  Heraeus is**
6 **a German company.**
7 Q.  Okay.  Is the -- do you know the
8 official, formal name of that company?
9 **A.  Heraeus.**
10 Q.  Heraeus Kulzer?
11 **A.  No.**
12 Q.  Just Heraeus?
13 **A.  Heraeus, yes.  It's the name of the**
14 **family.**
15 Q.  And does that company own or is it the
16 parent company of the company you work at, Heraeus
17 Kulzer LLC?
18 You have to speak.  You can't go like
19 that.
20 **MR. PATTERSON:** You --
21 **A.  Repeat the question?**
22 **MR. MOSKOWITZ:** Okay.  Can you read
23 the question back?
24 (The following record was read by
25 the reporter):

Page 15

ROMERO

2 **"QUESTION:** And does that company
3 own or is it the parent company of the
4 company you work at, Heraeus Kulzer
5 LLC?"
6 **A.  I don't know.**
7 **MR. PATTERSON:** And I'll object to
8 the question as vague.
9 You can answer it.
10 **A.  I don't know.**
11 **BY MR. MOSKOWITZ:**
12 Q.  Okay.  So is it fair to say that you
13 don't know the corporate ownership or control
14 between all these companies; is that correct?
15 **A.  That would be correct.**
16 Q.  Okay.  What is the business of the
17 company or companies that you refer to as Heraeus?
18 **A.  I don't know.  Repeat that question?**
19 Q.  What is the business -- what business
20 are they in, these companies, if you know?
21 **A.  Heraeus is a very large, global entity**
22 **that participates in many industrial sectors, as**
23 **far as I know, based on magazines and things of**
24 **that nature --**
25 Q.  Yes.

Page 16

ROMERO

2 **A.  -- if you --**
3 Q.  Okay.
4 **A.  -- website.**
5 Q.  And one of them is dental products?
6 **A.  Correct.**
7 Q.  And another one is metals, if you know?
8 **A.  Uh-huh, yes.**
9 Q.  Good, you're getting it.
10 All right.  Specifically speaking about
11 Heraeus Kulzer LLC now, that company has a main
12 office in South Bend, Indiana, correct?
13 **A.  Yes.**
14 Q.  How many people work in that office, if
15 you know?
16 **A.  I don't know the exact number.**
17 Q.  More than 50?
18 **A.  Yes.**
19 Q.  More than 100?
20 **A.  I don't know the exact number; I don't**
21 **think so.**
22 Q.  Okay.  If I said more than 200, your
23 answer would be no?
24 **A.  My answer would be no.**
25 Q.  Okay.  So the number of people there

Page 17

1 ROMERO
2 are, in your best guesstimate - and we're not
3 holding you to it - 50 to 100 people,
4 approximately?
5 A. That would be fair to say.
6 Q. Okay. Does Heraeus Kulzer LLC have an
7 office in Massachusetts, if you know?
8 A. No.
9 Q. Does it have an office in New York
10 State?
11 A. No.
12 Q. Does it have employees in New York State
13 or in the State of Massachusetts?
14 A. Yes.
15 Q. You are one of them?
16 A. Yes.
17 Q. Okay. How many more, if you know?
18 A. We have sales reps. We have one sales
19 rep in Massachusetts, and that's -- that's it.
20 Q. Okay. You said earlier that you visited
21 at Hanau, Heraeus, correct?
22 A. Yes.
23 Q. Now, Heraeus, I'll show you later in
24 documents, is more than one company in terms of
25 incorporated companies - okay? - or organized

Page 18

1 ROMERO
2 companies.
3 Do these companies share any facilities,
4 for example, if you know?
5 A. Not that I'm -- no, I don't know.
6 Q. You don't know.
7 Do they share the services of people;
8 for example, somebody working for Heraeus Kulzer
9 LLC would also work for or do some of his work for
10 Heraeus in Germany?
11 Do you know that one way or another?
12 A. I don't know that.
13 Q. You don't know that.
14 Do they advertise together? For
15 example, does Heraeus Germany, Heraeus in Germany,
16 advertise for the benefit of Heraeus in the United
17 States, if you know?
18 A. Not that I'm aware.
19 Q. How about the other way around; Heraeus
20 in the United States, Heraeus Kulzer LLC, do they
21 advertise for other companies?
22 A. Not that I'm aware.
23 Q. Okay. And the same is true with
24 marketing, doing marketing, joint-effort
25 marketing? Does that happen, if you know?

Page 19

1 ROMERO
2 No?
3 A. No.
4 Q. Okay. The company Heraeus Kulzer LLC,
5 specifically that company, does it -- okay.
6 Before -- I'll rephrase.
7 I'm going to ask you to look at page 2
8 of Exhibit 2, okay -- or look at page 3, okay?
9 Now, you reviewed this document. And if
10 you look in paragraph 6 on page 3 of Exhibit 2,
11 you will see that in this lawsuit are involved
12 four trademarks, and they are DURAFILL, iBOND,
13 GLUMA and CHARISMA.
14 Do you see that?
15 A. Yes.
16 Q. Now, does your company, Heraeus Kulzer
17 LLC, sell dental products under these names?
18 A. Yes.
19 Q. Okay. Do they sell those -- okay.
20 For ease of reference again, I'll call
21 them the Heraeus trademarked products -- or let me
22 come up with a better name.
23 MR. PATTERSON: How about the
24 products at issue?
25 MR. MOSKOWITZ: The products at

Page 20

1 ROMERO
2 issue, okay.
3 Q. These are the products at issue. If I
4 say the products at issue, they are these products
5 here.
6 Is that acceptable to you?
7 A. That will be fine.
8 Q. Does your company sell the products at
9 issue in Canada?
10 A. Yes.
11 Q. Does your company sell the products at
12 issue in Mexico?
13 A. I don't know.
14 Q. Okay. Do you know if they sell them
15 in -- anywhere in Europe?
16 A. I don't know.
17 Q. Same question; anywhere in Asia?
18 A. Anywhere in Asia?
19 Q. Yeah.
20 A. Yes.
21 Q. Where?
22 A. Clearly in China.
23 Q. Does Heraeus Kulzer LLC send product
24 from the United States --
25 A. No.

Page 29

ROMERO

1
2 Q. Again, it shows an address at 540
3 Madison Avenue, and you know nothing about that
4 address?
5 A. Nope.
6 MR. MOSKOWITZ: Okay. Okay. We're
7 going to go next to Exhibit 4. You can put
8 this aside.
9 MR. PATTERSON: I'm going to keep
10 these straight for you.
11 MR. MOSKOWITZ: Okay. I'm going to
12 mark as Exhibit 4 a document that states on
13 the upper left-hand corner, "Heraeus Dental
14 North America."
15 (DEFENDANT EXHIBIT 4, "Heraeus
16 Dental North America" internet document,
17 marked for identification.)
18 BY MR. MOSKOWITZ:
19 Q. Do you see that?
20 A. Yes.
21 Q. And then on the bottom it has a website
22 location, which is heraues-dental-us.com, in part.
23 See that?
24 A. Yes.
25 Q. Okay. Is Heraeus, dash, Dental, dash,

Page 30

ROMERO

1
2 US the website of your company where you work?
3 A. The website? Yes.
4 Q. Okay. Now, given that you said to me
5 that's the website of your company, which in fact
6 of course I know it is --
7 A. Right, yeah.
8 Q. -- I want to ask you about the name,
9 Heraeus Dental North America.
10 Is this just another name for Heraeus
11 Kulzer LLC?
12 A. I would say yes.
13 Q. Okay. And you see over here it says:
14 Welcome to Heraeus US.
15 And then it says: Heraeus is a globally
16 active precious metals and technology group with
17 firm roots in Hanau, Germany.
18 You see that?
19 A. Uh-huh.
20 Q. You have to --
21 A. I see that, yes.
22 Q. Okay. Thank you.
23 A. Yes.
24 Q. When you go "uh-huh" or shake your
25 head --

Page 31

ROMERO

1
2 A. It's not noted.
3 Q. Yeah, okay.
4 Okay. Is Heraeus US a part -- does this
5 suggest to you that Heraeus US is part of that
6 global Heraeus company?
7 MR. PATTERSON: Objection, calls
8 for speculation.
9 You can answer it.
10 A. I would say yes.
11 MR. MOSKOWITZ: Okay. And if you
12 look -- let me see.
13 Okay. That's all for this exhibit.
14 Let's go to the next exhibit, which is going
15 to be Exhibit 5. Now, Exhibit 5 is --
16 consists of two pages that I myself took off
17 the internet, okay? And you can see the
18 date, March 17, okay?
19 (DEFENDANT EXHIBIT 5, Internet
20 document identifying Dr. Martin Haase,
21 marked for identification.)
22 BY MR. MOSKOWITZ:
23 Q. Now, on the right-hand side it lists, as
24 the -- as the managing director, Dr. Martin Haase.
25 Did you ever hear his name?

Page 32

ROMERO

1
2 A. Yes.
3 Q. Did you ever meet him?
4 A. Yes.
5 Q. Has he worked in South Bend, Indiana for
6 any period of time?
7 A. No.
8 Q. Has he visited there?
9 A. Yes.
10 Q. For what purpose?
11 A. Meetings.
12 Q. Did you participate in meetings when he
13 was present?
14 A. Yes.
15 Q. Okay. Did any of those meetings involve
16 this lawsuit or the topic of this lawsuit?
17 A. No.
18 Q. Do you see on the left-hand side,
19 "Company Overview," it says: Heraeus Kulzer GmbH?
20 Okay. Do you see that name?
21 A. Yes.
22 Q. Does that now educate you that there is
23 a company called Heraeus Kulzer GmbH?
24 A. Yes.
25 Q. Okay. And Martin Haase, Dr. Martin

Page 45

ROMERO

1  ROMERO
2  I'm pointing you to it, and it says that
3  an open position is controller, accounting, dash,
4  finance, manufacturing and other stuff, South
5  Bend, Indiana.
6  You see that?
7  A. Yes.
8  Q. Are you -- is your company looking right
9  now for such -- for somebody for such a position?
10 A. I don't know.
11 Q. Okay. Do you have any idea why Heraeus
12 Holding, which is another company, is advertising
13 for jobs for Heraeus US?
14 A. I don't know.
15 Q. Okay. Do you know one way or another if
16 Julia Heraeus owns the entire company?
17 A. I don't know.
18 Q. Okay. Your title at the company is, is
19 it not -- let me just look at this -- director of
20 dealer relations, slash, national accounts?
21 A. Yes.
22 Q. Do you report to Mike D'Errico?
23 A. Yes.
24 Q. Do you report to Chris Holden through
25 Mike?

Page 47

ROMERO

1  ROMERO
2  A. I am the director of dealer relations.
3  Essentially my interaction with the distribution
4  network entails anything from advertising,
5  promotions, rebate programs, social events,
6  business events. I am the liaison to the
7  distribution network of Heraeus Kulzer LLC.
8  Q. And you talked about the distribution --
9  A. Network.
10 Q. -- network.
11 Does Heraeus US sell directly to
12 dentists?
13 A. No.
14 Q. So it sells the products at issue only
15 through the distribution network?
16 A. That is correct.
17 Q. And you actually manage that
18 distribution network?
19 A. Yes.
20 Q. Okay. How is the director of marketing
21 job different than your job?
22 A. She markets.
23 Q. Okay.
24 A. I don't -- her job -- again, I'm
25 responsible for the distribution side of the

Page 46

ROMERO

1  ROMERO
2  A. No.
3  Q. Do you report also directly to Chris
4  Holden?
5  A. No.
6  Q. You report to Mike --
7  A. Yes.
8  Q. -- and Mike reports to Chris?
9  A. Correct.
10 Q. Now, Nicole Turner is in charge of
11 marketing?
12 A. Correct.
13 Q. She's the director of marketing?
14 A. Correct.
15 Q. And Dennis Dalton -- or Denise? I don't
16 know how you pronounce it. Dennis?
17 A. Dennis.
18 Q. Dennis, of course. Dennis Dalton is the
19 director of sales?
20 A. No.
21 Q. What's his position?
22 A. He hasn't been with the company in a
23 very long time.
24 Q. Okay. Describe to me your function in
25 the company.

Page 48

ROMERO

1  ROMERO
2  business. She's responsible for the marketing
3  side; the positioning of the products in the
4  marketplace, the approach to the market, that type
5  of function.
6  Q. Okay. If there are complaints from the
7  dealers, do they come to you?
8  A. Ultimately it comes to me.
9  Q. Yeah. I've seen some e-mails that you
10 sent to Amanda Holland --
11 A. Yes.
12 Q. -- when there were issues.
13 Now, why did you send them to Amanda
14 Holland?
15 A. The e-mails that you're referencing, I'm
16 assuming, are the ones in the PDF that was earlier
17 talked about. Those e-mails were sent to Amanda
18 Holland for the purpose of this -- of this
19 proceedings [sic]. Amanda Holland was not a
20 person that was involved of the -- of [sic] any of
21 these issues prior to collecting the information
22 for the attorneys.
23 Q. Okay. So she's the person that worked
24 with the attorneys?
25 A. She was a person internally that was

Page 69

1  ROMERO
2  Do you see that?
3  A. Uh-huh.
4  Q. And it shows that the owner changed from
5  Bayer to Heraeus Kulzer GmbH.
6  Do you see that?
7  A. Yes.
8  Q. Okay. And then if you look at the next
9  page -- or turn two pages, 2 out of 4, one more
10 page -- it shows that as far as CHARISMA is
11 concerned, the last registered owner is Heraeus
12 Kulzer GmbH?
13 A. Yes.
14 Q. Which is Federal Republic -- well,
15 F-E-D, R-E-P, Germany, correct?
16 A. Yes.
17 Q. And it gives the Hanau location?
18 A. Yes.
19 Q. Okay. Now, that's not the location of
20 your company?
21 A. No.
22 Q. And that's not the name of the company
23 where you work?
24 A. Correct.
25 Q. If you go to -- turn the pages to the

Page 71

1  ROMERO
2  Q. Okay. So another company owns the
3  trademark iBOND, correct?
4  A. I don't know.
5  Q. All right. Just -- you know, I won't
6  bother you to pick up the document again. In this
7  document, DURAFILL, which is the last two pages,
8  again it shows the owner -- yeah, you can look at
9  the last two pages -- shows the last owner, last
10 listed owner, as Heraeus Kulzer GmbH, right?
11 A. Yes.
12 Q. And that's not the company you work for?
13 A. Correct.
14 Q. And that's not the company whose name is
15 on the complaint in Exhibit 2?
16     If you look at Exhibit 2 - right? -
17 that's not the same name?
18 A. According to the document, no.
19 Q. Okay. Now, I showed you earlier that in
20 the complaint, the trademarks that are listed are
21 these four trademarks, which are not the
22 trademarks of the company you work for, correct?
23     Well, I'll take that question back; I
24 won't put you through it.
25     These products at issue, I think we

Page 70

1  ROMERO
2  iBOND.
3      Again, the same thing applies; the owner
4  of this trademark, iBOND, is Heraeus Kulzer GmbH
5  and not the company that you work for, correct?
6  A. I don't know.
7  Q. Well, do you work for Heraeus Kulzer
8  GmbH?
9  A. No.
10 Q. Well, isn't Heraeus Kulzer GmbH the
11 company that is listed as the owner?
12    MR. PATTERSON: Are you asking him
13 what the document says or if he knows who
14 actually owns the trademark? I think that's
15 why he said he didn't know.
16 Q. Okay. Your attorney is right. I
17 shouldn't put you through this because you are not
18 an attorney, correct?
19 A. I am not an attorney.
20    MR. PATTERSON: He can tell you
21 what the document says.
22    MR. MOSKOWITZ: Okay. Very good.
23 Q. Well, the document doesn't identify the
24 owner of iBOND as your company that you work for?
25 A. According to the document, no.

Page 72

1  ROMERO
2  established, are manufactured and boxed in Europe?
3  A. Yes.
4  Q. Okay. Does your company have any
5  representative or anybody there that you know
6  works there to watch the manufacturing process, to
7  assure quality -- the quality is correct?
8  A. Repeat that question?
9  Q. Does your company -- and when I say your
10 company, it means Heraeus US -- have any
11 representative in Europe to observe and watch --
12 A. No.
13 Q. -- the manufacturing process?
14 A. Not that I'm aware.
15 Q. Okay.
16 A. Let me rephrase that. I don't know is
17 probably a better answer.
18 Q. Uh-huh. Is it true that, the best of
19 your knowledge, that's not the case?
20 A. Correct.
21 Q. Okay. And the product, after it's
22 manufactured, do you know where it's stored before
23 it's shipped anywhere?
24 A. I don't know.
25 Q. And when the product is -- is shipped to

**HERAEUS KULZER LLC VS.**
**OMNI DENTAL SUPPLY**

Page 73

1 ROMERO
2 the United States, for example, upon an order by
3 Heraeus US, do you know how it's shipped to the
4 US?
5 **A. My assumption is that there are two**
6 **ways, by air or by sea.**
7 Q. Good. How do you know -- do you know
8 how it's kept? For example, is any of it
9 refrigerated?
10 **A. I don't know.**
11 Q. Then eventually the product arrives in
12 the United States, correct?
13 **A. Yes.**
14 Q. Is it shipped to South Bend or to
15 another location?
16 **A. It eventually arrives in South Bend.**
17 Q. Okay. Stated another way, is your
18 company -- does your company store or have a
19 warehouse for the product at South Bend?
20 **A. Yes.**
21 Q. Does it have a location for the product,
22 a warehouse for the product, anywhere else to your
23 knowledge?
24 **A. I don't know.**
25 Q. Who would know the answer to that

Page 74

1 ROMERO
2 question in your company?
3 **A. I would imagine distribution people.**
4 Q. Who is the head of that group?
5 **A. At the moment, Chris Holden.**
6 Q. Okay. And does it get shipped from --
7 to the best of your knowledge, from South Bend to
8 the distributors based on orders that come in?
9 **A. Yes.**
10 Q. Does your company have people that
11 monitor how the distributors handle the product?
12 **A. That would be me.**
13 Q. Good. If I say Henry Schein, you know
14 who that is?
15 **A. Yes.**
16 Q. Did you see the warehouse facilities of
17 Henry Schein?
18 **A. I have.**
19 Q. And where is it stored, the product?
20 **A. In refrigerated rooms.**
21 Q. Okay. Where is Henry Schein located?
22 **A. The corporate address or the**
23 **distribution centers?**
24 Q. The distribution center.
25 **A. They have several. I have visited**

Page 75

1 **ROMERO**
2 **Denver, Pennsylvania and Indianapolis, Indiana.**
3 Q. Okay. Now, besides you, are there other
4 people who actually monitor or control or issue
5 directions of how the product is stored, shipped,
6 et cetera?
7 **A. I would have to answer no.**
8 Q. Has Henry Schein ever --
9 **A. Can I go back?**
10 Q. Sure.
11 **A. Our quality -- our quality people, the**
12 **Regulatory Department, would be -- would have**
13 **knowledge of the requirements of storage.**
14 Q. Has Henry Schein, for example, ever
15 shipped any of the products at issue here with an
16 expired date?
17 **A. I don't know.**
18 Q. Okay. Has Henry Schein ever shipped a
19 product of the products at issue that was
20 defective, if you know?
21 **A. I don't know.**
22 Q. Has Henry Schein ever shipped a product
23 at issue that they received from you after
24 changing the expiration date, if you know?
25 **A. I don't know.**

Page 76

1 **ROMERO**
2 **MR. PATTERSON:** Max, can we take a
3 quick bathroom break?
4 **MR. MOSKOWITZ:** Yeah.
5 (Recess taken.)
6 **MR. MOSKOWITZ:** I'm going to mark
7 as the next exhibit, 21, a one-page document,
8 which is a photo that was taken at the
9 offices of your attorneys recently, showing
10 certain boxes of product; in this case, the
11 CHARISMA, DURAFILL, GLUMA and GLUMA
12 Desensitizer product.
13 (DEFENDANT EXHIBIT 21, Photo of
14 product boxes, marked for
15 identification.)
16 **BY MR. MOSKOWITZ:**
17 Q. Do you see that?
18 **A. Yes.**
19 Q. Have you ever seen this product that is
20 depicted in these pictures?
21 **A. Yes.**
22 Q. Okay. Where did you see it?
23 **A. I've seen it at the office in South**
24 **Bend, Indiana, at the Heraeus Kulzer LLC office in**
25 **South Bend, Indiana.**

Page 97

1    **ROMERO**
2    **Amanda Holland.**
3    Q.  I just want to make sure that all of the
4    complaints from dentists or from dealers about the
5    products at issue --
6    A.  **Right.**
7    Q.  -- were produced.
8    A.  **Not all the documents that are in that**
9    **package were forwarded by me. There was other**
10   **documents that I don't know who produced them.**
11   Q.  Okay.  So you produced some documents
12   and others produced other documents, and that is
13   what was forwarded to us?
14   A.  **Yes.**
15   Q.  Do you have any reason to believe that
16   somebody held back relevant documents or didn't
17   disclose any information to us?
18   A.  **I don't know.**
19   Q.  Okay.  When was the first time you heard
20   of the name Omni Dental, my client?
21   A.  **I can't say specifically, but a**
22   **significant length of time.**
23   Q.  Couple of years?
24   A.  **Much more than that, much more than**
25   **that.**

Page 98

1    **ROMERO**
2    Q.  Five years?
3    A.  **At a minimum.**
4    Q.  At the minimum, five years you knew
5    that there is a company called Omni Dental
6    Products [sic]?
7    A.  **Correct.**
8    Q.  Did you know they were selling
9    gray-market goods?
10   A.  **That was my assumption.**
11   Q.  I mean, that was your knowledge?
12   A.  **That was my assumption.**
13   Q.  Okay.  And it's possible that that
14   assumption of yours is -- goes back even more than
15   five years, correct?
16   A.  **It would only go back to my knowledge of**
17   **the company, of Omni.**
18   Q.  So you're saying that since you've been
19   working for Heraeus, you also knew of Omni Dental?
20   A.  **No.  I only know of Omni Dental, as I**
21   **said, at least five years, if not longer.  I can't**
22   **specify the "longer" part of it.**
23   Q.  Okay.  It could be that others at the
24   company have known of Omni Dental prior to your
25   knowledge?

Page 99

1    **ROMERO**
2    A.  **That is very possible.**
3    Q.  Okay.  Now, I mentioned in my question
4    gray market.
5    A.  **Uh-huh, yes.**
6    Q.  And you know what gray-market products
7    are, correct?
8    A.  **My understanding --**
9    Q.  Oh, I didn't -- I didn't ask you to
10   explain what it is.  I said --
11   A.  **Yes.**
12   Q.  The term "gray market" is in your
13   e-mails?
14   A.  **Yes.**
15   Q.  You have an understanding of what it is?
16   A.  **Yes.**
17        **MR. MOSKOWITZ:** So I will show you
18   what I'm going to mark as Exhibit 27.  And as
19   you can see, this is also from Merriam
20   Webster dictionary, and they give a
21   definition of gray market.
22        (DEFENDANT EXHIBIT 27, Merriam
23        Webster gray-market definition, marked
24        for identification.)
25        **BY MR. MOSKOWITZ:**

Page 100

1    **ROMERO**
2    Q.  They say:  A market employing irregular
3    but not illegal methods; especially a market that
4    legally circumvents authorized channels of
5    distribution to sell goods at prices lower than
6    those intended by the manufacturer.
7        You see that?
8    A.  **Yes.**
9    Q.  Does that definition agree with your
10   definition of what gray market is?
11   A.  **Yes.**
12   Q.  Okay.  With the definitions that we have
13   for counterfeit and gray market, to your
14   knowledge, has Omni Dental ever sold a counterfeit
15   product that is a counterfeit of a Heraeus
16   trademark?
17   A.  **Not that I'm aware of.**
18   Q.  And the issue in this lawsuit is about
19   gray-market goods sold by Omni Dental, correct?
20   A.  **That is my understanding.**
21   Q.  Okay.  Is there any complaint that your
22   company, Heraeus Kulzer LLC, has against my
23   client, Omni Dental, on any other issue; for
24   example, selling product with expired dates for
25   example?

Page 101

1     ROMERO
2  A.  I don't --
3      MR. PATTERSON: Objection, calls
4  for speculation.
5      You can answer.
6  A.  I don't know.
7  Q.  An Heraeus product with an altered date?
8      MR. PATTERSON: Same objection.
9  A.  I don't know.
10 Q.  An Heraeus product not properly shipped
11 or refrigerated?
12     MR. PATTERSON: Same objection.
13 A.  I don't know.
14 Q.  But the one thing you do know is that
15 the lawsuit is based on the sale of gray-market
16 Heraeus products?
17 A.  That is correct.
18 Q.  Okay. Have you yourself been involved
19 with marketing of the products at issue here?
20 A.  Not directly.
21 Q.  Okay. Have you yourself ever looked on
22 the internet or in magazines or in other places to
23 see if anybody else besides Omni Dental sells
24 gray-market Heraeus products?
25 A.  Rephrase that question, please?

Page 102

1     ROMERO
2  Q.  One way or another, to your knowledge,
3  is Omni Dental the only one that sells gray-market
4  Heraeus products?
5  A.  Not that I'm aware.
6  Q.  Well, to explain that answer, are you
7  aware of anybody else selling Heraeus brand -
8  okay? - gray-market goods?
9  A.  I'm aware of instances, yes.
10 Q.  Do you know some of the names?
11 A.  Off the top -- in the documents, there
12 was a reference to a Dental Savings.
13 Q.  Yeah.
14 A.  There may be many others that I don't
15 recall at this point. I'm sure there are others;
16 I don't recall the names.
17 Q.  And does your knowledge of others being
18 out there with gray-market Heraeus products goes
19 back -- go back -- goes back also about five
20 years, at least?
21 A.  Yes.
22 Q.  To your knowledge, did your company ever
23 file a lawsuit against anybody else on the grounds
24 that they sell gray-market Heraeus products?
25 A.  I don't know.

Page 103

1     ROMERO
2  Q.  If there was such a lawsuit, would you
3  know?
4  A.  I don't know.
5  Q.  Okay. Do you know anything about the
6  distribution agreement signed between Heraeus
7  Kulzer LLC and Heraeus Kulzer GmbH?
8  A.  Yes. That's part of the documents that
9  I was -- that I reviewed.
10 Q.  What do you know about that agreement?
11 A.  That agreement gives Heraeus Kulzer LLC
12 exclusive importation rights to that brand for
13 North America, is my general understanding.
14 Q.  Did you have any connection or part in
15 negotiating or preparing that document?
16 A.  No.
17 Q.  It's all Chris Holden?
18 A.  I don't know.
19 Q.  Were there ever kind of around-the-table
20 discussions at the company, with no lawyers
21 present, discussing this gray-market problem at
22 the company?
23 A.  No.
24 Q.  You don't recall such meetings, but
25 there may have been such meetings?

Page 104

1     ROMERO
2  A.  Casual conversations; I wouldn't call
3  them meetings.
4  Q.  Okay. Were there casual conversations
5  about a gray-market problem?
6  A.  Yes.
7  Q.  Did you have such a casual conversation
8  with Chris Holden?
9  A.  I don't recall particularly.
10 Q.  Did you have such a conversation with
11 any dealers?
12 A.  That topic comes up.
13 Q.  With the dealers?
14 A.  Yes.
15 Q.  And are the dealers asking you to do
16 something about it?
17 A.  Yes.
18 Q.  Are they asking you to file a lawsuit?
19 A.  No.
20 Q.  What do they want you to do?
21 A.  It's not specific.
22 Q.  They must say something, don't they?
23 A.  Take care of the problem.
24 Q.  Is the problem of gray-market product
25 that they're sold at too low a price?

Page 105

ROMERO

2 A. One of the problems.

3 Q. Is that a problem that is mentioned

4 often by dealers?

5 A. Yes.

6 Q. Almost by all of them?

7 A. Yes.

8 Q. You said there are other problems. Name

9 them.

10 A. There is a financial loss, a harm, to

11 Heraeus; to the distributor; to me. There is

12 clinical risk to the -- to the end user; to the

13 patient. There is harm to the brand.

14 Q. What's the harm to you personally?

15 A. To me?

16 Q. Yeah.

17 A. Products that could have been sold

18 through legitimate distribution networks, for

19 which I'm compensated for, was not sold because of

20 gray market.

21 Q. Your compensation is somehow tied to the

22 level of sales?

23 A. Correct.

24 Q. What's the clinical risk?

25 A. The clinical risk is that a dentist or a

Page 106

ROMERO

2 clinician unknowingly may use a product that he

3 believes to be legitimate Heraeus Kulzer LLC

4 product for distribution in North America, which

5 may not perform to the standards that he expects;

6 therefore, damaging the reputation of the brand

7 broadly.

8 Q. And what would be a reason that the

9 gray-market product would not perform identically

10 to the product sold through Heraeus Kulzer LLC?

11 A. From my perspective, the custody chain,

12 in terms of knowledge of the storage and shipping

13 of the product.

14    MR. MOSKOWITZ: Would you read that

15 back?

16    (The following record was read by

17 the reporter):

18    "ANSWER: From my perspective, the

19 custody chain, in terms of knowledge of

20 the storage and shipping of the

21 product."

22    BY MR. MOSKOWITZ:

23 Q. Anything else?

24 A. That would be the principal reason.

25 Products are sensitive to storage conditions.

Page 107

ROMERO

2 Q. Do you know one way or another if people

3 who run gray-market businesses are dishonest or

4 unscrupulous?

5    MR. PATTERSON: Objection, calls

6 for speculation.

7    You can answer.

8 Q. If you know.

9 A. I don't know.

10 Q. Why -- how do you know that the same

11 thing, problems with shipping and problems with

12 storage, cannot occur through your dealership or

13 through the shipping to the United States or

14 through the storage in customer depots? How do

15 you know that one way or another?

16 A. I don't know.

17 Q. It could happen there too, right?

18 A. I don't know.

19 Q. The possibility is there, isn't it?

20 A. There is a possibility.

21 Q. Okay. Do you know a single dentist --

22 not do you know physically. Do you know of a

23 single dentist that purchased an Omni gray-market

24 Heraeus product?

25 A. No.

Page 108

ROMERO

2 Q. Nobody in the entire country?

3 A. I don't know.

4 Q. Okay. You're here only to answer what

5 you know. You're not speaking for the company; we

6 know that. That's fine.

7    Who in the company is a person who

8 should know about such a dentist?

9    MR. PATTERSON: Objection, calls

10 for speculation.

11    You can answer.

12 A. Technical services would get complaints

13 from specific dentists. It's not my

14 responsibility.

15 Q. Well, we asked for the identity of all

16 such dentists, and we were provided by Heraeus

17 with certain documents.

18    Do you have any reason to question the

19 production of the -- by Heraeus of these

20 documents, that it's anything but complete?

21 A. I -- I -- I don't know.

22 Q. You assume they did their job?

23 A. Yes.

24 Q. Okay.

25 A. Yeah.

Page 141

1 **ROMERO**
2 **do their jobs.**
3 Q. Have you heard one way or another of a
4 lawsuit being filed on these issues other than
5 this one here?
6 **A. I'm familiar with others.**
7 Q. There are other lawsuits?
8 **A. I have heard.**
9 Q. Against who?
10 **A. It was published that a company by the**
11 **name of DMG pursued a gray-market dealer. It was**
12 **also published in dental magazines that a company**
13 **by the name of GC America also had some**
14 **litigation. Those are the two that I'm familiar**
15 **with.**
16 Q. So these are other companies --
17 **A. Yes.**
18 Q. -- not Heraeus --
19 **A. No, other manufacturers.**
20 Q. Other manufacturers that are --
21    **MR. PATTERSON:** Let him ask before
22 you answer so it's clear.
23    **THE WITNESS:** Sorry.
24    **MR. PATTERSON:** That's okay.
25 Q. Other manufacturers that are pursuing

Page 142

1 **ROMERO**
2 gray-market sellers; that's what your answer is?
3 **A. That I'm aware that such cases have**
4 **been -- have happened or --**
5 Q. Okay. And as far as Heraeus US
6 specifically is concerned, other than pursuing my
7 client for selling gray-market Heraeus products in
8 this lawsuit, do you know one way or another if
9 they filed any other lawsuits --
10 **A. I don't know.**
11 Q. -- against somebody else on the same
12 grounds?
13 **A. I don't know.**
14 Q. To your understanding, when a dentist
15 buys a gray-market product -- let me rephrase.
16    You know what gray-market products are,
17 correct?
18 **A. I believe I do.**
19 Q. Do many other people know what
20 gray-market products are, if you know?
21 **A. I don't know.**
22 Q. I mean, based on your conversation with
23 the dealers, do dentists know what gray-market
24 products are?
25    **MR. PATTERSON:** Objection, calls

Page 143

1 **ROMERO**
2 for speculation.
3    You can answer.
4 **A. I don't know.**
5 Q. I'm going to try to get the question
6 phrased properly.
7    You speak with dealers, correct?
8 **A. Yes.**
9 Q. And I would say that's what you do on an
10 ordinary basis?
11 **A. Yes.**
12 Q. That's your job function?
13 **A. Part of the functions.**
14 Q. Okay. And dealers bring up the topic of
15 the sales of gray-market Heraeus products that
16 hurt them, right?
17 **A. Occasionally.**
18 Q. Do you know from those dealers that
19 dentists know what gray-market products are?
20 **A. I don't know.**
21 Q. You don't recall?
22 **A. Are you asking me if I know --**
23 Q. Let me -- I'm going to rephrase.
24    When dealers discuss with you gray
25 market, do they bring up dentists, individual

Page 144

1 **ROMERO**
2 dentists?
3 **A. No.**
4 Q. Okay. Does the sales force at Heraeus
5 that goes and visits dentists and dental offices
6 discuss with them gray-market Heraeus products?
7 **A. I don't know.**
8 Q. Are dentists the type of individuals who
9 are highly trained, in your view?
10    **MR. PATTERSON:** Objection, calls
11 for speculation.
12    You can answer.
13 **A. I would say yes.**
14 Q. They've got to be -- they go through
15 many, many years of schooling and -- and clinical
16 work to learn what they do, right?
17 **A. Yes.**
18 Q. Do you agree with me that they know the
19 products that they're using?
20    **MR. PATTERSON:** Objection, calls
21 for speculation.
22    You can answer.
23 **A. I don't know.**
24    **MR. MOSKOWITZ:** We are up to
25 Exhibit 39.

Page 145

1     ROMERO
2     (DEFENDANT EXHIBIT 39, 5/25/11
3     press release, marked for
4     identification.)
5     BY MR. MOSKOWITZ:
6  Q. Is this Exhibit 39 a press release
7     issued by your company on May 25, 2011 -- or dated
8     May 25, 2011?
9  A. Yes.
10 Q. Have you seen this document prior to
11    today?
12 A. I probably did.
13 Q. And by that, you mean that you saw it
14    around the time that it was released?
15 A. Yes.
16 Q. Did you read it at the time?
17 A. I can't recall.
18 Q. You read it recently, in preparation for
19    this deposition, right?
20 A. Yes.
21 Q. Did you agree with all the statements
22    that are made in it as you read through it?
23 A. In the cursory, you know, read that I
24    took of it, yes.
25 Q. Now, this is a press release that I

Page 146

1     ROMERO
2     found on your website. And my question is -- if
3     you look at the third page, it has a section about
4     Heraeus.
5     Do you see that?
6  A. Yes.
7  Q. And it describes -- by the way, the name
8     Heraeus is on the very first page in very large
9     letters?
10 A. In the --
11 Q. No. On page 1, on the top.
12 A. On the top, yes.
13 Q. Heraeus, right?
14 A. Yes.
15 Q. And when you go to the third page, where
16    the topic is "About Heraeus," it says: Heraeus,
17    the precious metals and technology group
18    headquartered in Hanau, Germany, is a global
19    private company with business segments of precious
20    metals, dental health, sensors, quartz glass and
21    specialty lighting sources.
22    Why does your company put out a press
23    release describing itself as being an
24    international company?
25 A. I don't know.

Page 147

1     ROMERO
2  Q. Is that because you're part of all of
3     this family of companies all privately owned by
4     the same people, if you know?
5  A. I don't know.
6  Q. Chris Holden is quoted in this
7     document --
8  A. Uh-huh, yes.
9  Q. -- in the paragraph on the second page.
10 A. I think I'm on the second page.
11    Yes, I am.
12 Q. Okay. In the second paragraph --
13 A. Yes.
14 Q. -- in the second sentence, it starts
15    with "However"...
16    You see that?
17 A. Yes.
18 Q. And this exhibit discusses gray-market
19    products, correct?
20 A. Yes.
21 Q. Okay. Now, it says, and I quote:
22    However, with the recent economic global downturn,
23    distributors and doctors have been forced to find
24    ways to conserve, slash, reduce costs. These
25    attempts to cut corners, quote/unquote, have

Page 148

1     ROMERO
2     placed a brighter light on the gray-market
3     problem, have resulted in risky approaches to
4     savings and have created potential problems with
5     serious repercussions on several fronts, closed
6     quote.
7     Do you see that?
8  A. Yes.
9  Q. I mean, does this suggest to you --
10    because that's what it suggests to me, is that the
11    doctors know what they're buying and they're just
12    trying to buy -- to save money?
13    MR. PATTERSON: Objection, calls
14    for speculation.
15    You can answer.
16 A. I don't know what the dentist is
17    thinking.
18 Q. He wants to save money, doesn't he?
19 A. According to the paragraph, that's what
20    it implicates.
21 Q. Well, according to that paragraph, the
22    dentist is not confused. He may be not doing the
23    right thing, but he wants to save money?
24 A. You could arrive at that conclusion.
25 Q. Are dealers telling you that dentists

Page 149

ROMERO

2 are telling them that they want to buy the
3 gray-market products because they're cheaper?
4 A.  Repeat that question?
5 Q.  Are dealers telling you that dentists
6 are telling to the dealers -- saying to the
7 dealers that they want to buy gray-market products
8 because they are cheaper?
9 A.  I don't know.
10 Q.  Nobody said that to you?
11 A.  No.
12 Q.  If there is one person at your company
13 that would know if dentists are confused or they
14 don't buy the product that they want when they buy
15 gray market, who would that person in your company
16 be, if you know?
17 A.  I don't know.
18 MR. MOSKOWITZ: Okay.  And this is
19 not a question to you, Mr. Romero, but to
20 Mr. So.
21 Can we clarify for the record that
22 the corporate entity that you are with is
23 Heraeus Inc., Mr. So?
24 MR. PATTERSON: He must have
25 dropped off.

Page 150

ROMERO

2 MR. MOSKOWITZ: Sir, are you there?
3 Is Mr. So, Counsel, based in New
4 York or in Boston?
5 MR. PATTERSON: I'm actually not
6 sure where he's physically located.
7 MR. MOSKOWITZ: He's not in your
8 office?
9 MR. PATTERSON: No, he's not a
10 lawyer with Nelson Mullins, no.
11 MR. MOSKOWITZ: Okay.  He's not
12 with Nelson Mullins, he's with -- I asked
13 earlier in the deposition, because I located
14 a company, Heraeus Inc., and Heraeus Inc. is
15 located in Manhattan.  And I wanted to know,
16 when he called in, is he physically in
17 Manhattan?
18 MR. PATTERSON: No.
19 MR. MOSKOWITZ: Do you know where
20 he is physically?
21 MR. PATTERSON: Today?
22 MR. MOSKOWITZ: Yes.
23 MR. PATTERSON: No, I don't know
24 where he's physically located.  I know he's
25 not based in New York.  He would have to

Page 151

ROMERO

2 travel -- I know he's traveling up to Boston
3 for the depositions Thursday, but I don't
4 know where his physical office is located.
5 MR. MOSKOWITZ: Okay.
6 MR. PATTERSON: But if you've got
7 any more questions for Mr. Romero, you can
8 finish up with him and I'm glad to talk with
9 you about anything else after --
10 MR. MOSKOWITZ: Yes.  I will now
11 take my last break, and -- wait.  Before we
12 do that, I just want to see if there's any
13 other documents.
14 Q.  Were you involved at all in changing the
15 boxes, you know, the box color or the box writing,
16 to distinguish between the packaging in which the
17 product is sold in the U.S. versus in China, for
18 example?
19 A.  No.
20 MR. MOSKOWITZ: Okay.  I'm going to
21 take my five-minute break and see if we can
22 be done, okay?
23 MR. PATTERSON: Okay.
24 (Recess taken.)
25 BY MR. MOSKOWITZ:

Page 152

ROMERO

2 Q.  Mr. Romero, if the sales force goes into
3 the field and they go meet a dentist and convince
4 a dentist to buy Heraeus product, which dealer
5 gets the sale?
6 A.  The decision to purchase is the decision
7 of the dentist.
8 Q.  You give him the name of one dealer or
9 a whole bunch of them?
10 A.  We -- our people are instructed to ask
11 the dentist for his dealer of choice.
12 Q.  What does dealer of choice mean?
13 A.  The dentist has distributors that he
14 does business with.  He tells us, we don't tell
15 the dentist, what dealer to put the order through.
16 Q.  I see.  So if a dentist has a
17 relationship with Henry Schein, and Henry Schein
18 carries the particular product, he'll buy it from
19 Henry Schein, correct?
20 A.  Yes.
21 Q.  And if that dentist has a relationship
22 with Patterson, the dentist can make that
23 decision?
24 A.  Yes.
25 Q.  As to the sales force itself, do you

Page 153

ROMERO

1 have any interaction with them? Do you talk to
2 them; do you train them?
3
4 A. I don't train them on the products.
5 Q. What do you do with them?
6 A. I speak to them as to my role when
7 they're in the training phase.
8 Q. Elaborate on that a little bit.
9 A. When we hire a rep, they come into
10 the -- into the -- they go for training. And as
11 part of the training schedule, I'm given about 15
12 to 30 minutes to introduce myself and let them
13 know what my role is.
14 Q. And what do you tell them your role is?
15 A. I'm the director of dealer relations and
16 special markets.
17 Q. Say that again?
18 A. Director of dealer relations and special
19 markets.
20 Q. Okay. Do you give them any tips on
21 salesmanship or anything like that?
22 A. No.
23 Q. Do you give them your business card to
24 call you on any issues?
25 A. It isn't necessary. I don't.

Page 154

ROMERO

1
2 Q. Okay. These sales reps are independent
3 sales reps or company employees?
4 A. They are company employees.
5 Q. How many are there of them?
6 A. Presently, 54.
7 Q. If the sales rep wants to -- or comes
8 across issues with the product or customers, how
9 do they communicate it to the company?
10 A. Typically through their district
11 manager.
12 Q. How does the district manager
13 communicate the information to the company?
14 A. The district manager then either
15 e-mails -- not either. E-mails me with -- that's
16 really it, they e-mail me with issues. Issues
17 pertaining to dealers in the field are
18 communicated to me via e-mail --
19 Q. Okay.
20 A. -- primarily.
21 Q. So if sales reps have issues with
22 dealers, then they communicate it back and it
23 filters back to you?
24 A. That is correct.
25 Q. And if they have issues with dentists or

Page 155

ROMERO

1
2 with gray-market product, does it filter out the
3 same way to you?
4 A. Depending on the issue.
5 Q. Is there an issue that doesn't come to
6 you?
7 A. If it's a technical issue, I wouldn't
8 hear of it.
9 Q. Technical issue is what? Give me an
10 example.
11 A. Meaning instructions, clarifications.
12 Q. On the product?
13 A. On the product, on the usage.
14 Q. If it's a complaint, such as about a
15 counterfeit product or a gray-market product,
16 would that filter back to you?
17 A. It should.
18 Q. Okay. And does that tell me that
19 whatever complaints there have been, they have
20 been identified in the documents that were
21 produced?
22      MR. PATTERSON: Objection, calls
23 for speculation.
24      You can answer.
25 A. The ones that came to me I produced.

Page 156

ROMERO

1
2 Q. And typically, my question was -- excuse
3 me let, me rephrase.
4      My question was, if there are issues
5 about counterfeits and gray market, these are the
6 type of issues that should come to you?
7 A. Correct.
8 Q. And, therefore - once again, I want to
9 make sure - I assume that all the documents on
10 those topics have been produced by you?
11 A. Yes.
12 Q. Who else was involved with searching for
13 products [sic]?
14      MR. PATTERSON: Objection to the
15 form.
16 Q. Excuse me. Who else at the company has
17 produced documents for this lawsuit that you have
18 seen?
19      MR. PATTERSON: Objection, asked
20 and answered.
21      You can answer it.
22 A. The files speak for themselves. The
23 e-mails' originations are in the file. I don't
24 know off the top of my head.
25      MR. MOSKOWITZ: Okay. Thank you

# EXHIBIT 7

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HERAEUS KULZER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION NO.   12-11099-RGS |
| | ) |
| OMNI DENTAL SUPPLY, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF REQUESTS FOR ADMISSIONS

Plaintiff Heraeus Kulzer, LLC ("Plaintiff"), by and through its undersigned attorneys, hereby responds and objects to Defendant's First Set of Requests for Admissions as follows:

### GENERAL OBJECTIONS

1.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it is inconsistent with, or seeks to impose obligations beyond those contained within, the Federal Rules of Civil Procedure and applicable law.

2.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it is overly broad or unduly burdensome.

3.      Plaintiff objects to each and every definition, instruction, and Request to the extent it is vague, ambiguous, and/or capable of multiple meanings.

4.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it requires Plaintiff to produce documents not within its possession, custody, or control within the meaning of the Federal Rules of Civil Procedure, or to the extent it requires

Plaintiff to obtain documents that are equally or more readily available to Defendant. Furthermore, Plaintiff objects to each and every Request to the extent it seeks documents, information, or things not known or reasonably available to Plaintiff.

5.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it seeks discovery that is obtainable from some other source that is more convenient, less burdensome, or less expensive.

6.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it seeks information that is neither relevant to the subject matter of this proceeding nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiff's responses or production of documents in response to the Requests is not an acknowledgement that such information or such documents are relevant or admissible into evidence. Plaintiff reserves all objections to the admissibility of the information provided or documents produced in response to the Requests.

7.      Plaintiff objects to each and every definition, instruction, and Request to the extent that it seeks discovery of information that is protected from disclosure pursuant to the attorney-client privilege, the work-product doctrine, and/or any other applicable evidentiary or discovery privilege, immunity, or protection.  Plaintiff hereby expressly claims such privileges, immunities, and protections to the extent implicated by any of the definitions, instructions, or Requests, and will exclude the privileged, immune, and protected information from its responses. Any disclosure of privileged, immune, or otherwise protected information in response to any Request is inadvertent and not intended to waive any applicable privilege, immunity, or protection.

8.      Plaintiff objects to each Request to the extent it is unnecessarily cumulative, duplicative, or repetitive.

9.      Plaintiff objects to each definition, instruction, and Request to the extent that it assumes disputed facts or legal conclusions in defining terms or describing the documents requested.   Plaintiff hereby denies any such disputed facts or legal conclusions.   Plaintiff further objects to each definition, instruction, and Request to the extent it mischaracterizes or misconstrues facts, issues, transactions, or events or mischaracterizes or misconstrues the nature of legal transactions.   Any responses to the Requests set forth herein, and any documents or information produced in response to any of the Requests, are without prejudice to the objections set forth in this paragraph, do not constitute agreement with Defendant's characterization of facts, events, transactions, or legal conclusions, and are not an acknowledgment of the existence of any facts or legal conclusions implied by Defendant's definitions, instructions, or Requests.

10.      Plaintiff objects to the definitions of "document", "box", "bottle" and "product literature" to the extent that they call for objects, items, or materials other than documents and information discoverable pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure.

11.      Plaintiff objects to the Requests to the extent that they seek the production of "all" documents under circumstances in which a production of a subset of all documents would be sufficient to show the pertinent information.

12.      Any response by Plaintiff stating that it will produce documents is not intended as a representation that such documents exist or are in Plaintiff's possession, custody, or control.   To the contrary, any such response is subject to the existence of such documents in

Plaintiff's possession, custody, or control, and location of such documents after a diligent and good-faith search.

13.     Plaintiff's specific objections set forth below are in addition to the general objections set forth in this section.  These general objections form a part of, and are hereby incorporated in, the response to each and every Request.  Thus, the absence of a reference to the general objections is not, and should not be construed as, a waiver of the general objections as to a specific Request.

## SPECIFIC RESPONSES TO REQUESTS FOR ADMISSIONS

Admit or deny, as the case may be, each and every one of the following statements.

1.     The Amended Complaint identifies (in paragraph 6) four trademarks, namely, DURAFILL; iBOND; GLUMA and CHARISMA.

**RESPONSE:** Admit.

2.     The GLUMA trademark referred to above is owned by Heraeus Kulzer GmbH, a German Company ("Heraeus Germany").

**RESPONSE:** Deny as stated, as request calls for a legal conclusion as to "owner" and does not distinguish between "registrants" and "assignees".  Plaintiff further answers by stating that the registration speaks for itself.

3.     The CHARISMA trademark referred to above is owned by Heraeus Germany.

**RESPONSE:** Deny as stated, as request calls for a legal conclusion as to "owner" and does not distinguish between "registrants" and "assignees".  Plaintiff further answers by stating that the registration speaks for itself.

4.     The iBOND trademark referred to above is owned by Heraeus Germany.

**RESPONSE:** Deny as stated, as request calls for a legal conclusion as to "owner" and does not distinguish between "registrants" and "assignees". Plaintiff further answers by stating that the registration speaks for itself.

     5.     The DURAFILL trademark referred to above is owned by Heraeus Germany.

**RESPONSE:** Deny as stated, as request calls for a legal conclusion as to "owner" and does not distinguish between "registrants" and "assignees". Plaintiff further answers by stating that the registration speaks for itself.

     6.     Heraeus Germany operates as a subsidiary of Heraeus Holding GmbH.

**RESPONSE:** Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany. However, subject to and not waiving this answer, upon information and belief Plaintiff admits the allegations.

     7.     Heraeus Germany is based in Hanau, Germany and has locations in Austria, Australia, Belgium, Brazil, China, France, Germany, Italy, Japan, Luxembourg, Mexico, the Netherlands, North America, Scandinavia, Spain, Switzerland, and the United Kingdom.

**RESPONSE:** Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany.

     8.     At least one of the North American locations of Heraeus Germany is at 300 Heraeus Way, South Bend, Indiana, in the United States.

**RESPONSE:** Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany. Plaintiff admits that Plaintiff has a location at the stated address.

9.     Heraeus Germany operates the Heraeus Kulzer Dental Division.

**RESPONSE:**  Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany and/or Heraeus Kulzer Dental Division.  Plaintiff objects to the extent the terms "Heraeus Kulzer Dental Division" and "operate" are undefined, vague, ambiguous, and/or capable of multiple meanings.

10.     Heraeus Germany has a website: http://heraeus-dental.com, at which it states that: "The name Heraeus stands for a successful and traditional history of a worldwide operating family-owned company."

**RESPONSE:**  Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany.  Plaintiff further answers by stating the website identified in the request speaks for itself.

11.     The Plaintiff Heraeus Kulzer, LLC ("Heraeus USA") is located at 300 Heraeus Way, South Bend, Indiana, and is an Heraeus Germany company location.

**RESPONSE:**  Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany.  Plaintiff admits that Plaintiff has a location at the stated address.

12.     Heraeus USA is fully owned and controlled by Heraeus Germany.

**RESPONSE:**  Deny, as stated.  Plaintiff admits that it is a wholly owned subsidiary.

13.     Heraeus USA operates a website which can be accessed at http://heraeus-dental-us.com (the "Heraeus USA website").

**RESPONSE:**   Plaintiff objects to the extent "operates" is undefined, vague, ambiguous, and/or capable of multiple meanings.   Plaintiff admits that the domain name identified in the request exists.

14.   The Heraeus USA website lists under its "Management" caption: (1) Dr. Martin Haase and (2) P. Christopher Holden.

**RESPONSE:**   Deny, as there is no "Management" caption in the domain name identified.

15.   Dr. Martin Haase is the Managing Director of Heraeus Germany.

**RESPONSE:**   Plaintiff lacks sufficient knowledge or information to form a belief as to the truth or falsity of the allegations of request as it calls for information from third party Heraeus Germany.

16.   The Heraeus USA website lists the company Heraeus Germany and gives as the number of its employees as 1,397 as of the end of 2010, and also lists revenues of 305.9 million Euros.

**RESPONSE:**   Deny, as domain name identified in the request lists no such information.

17.   The GLUMA product sold by Heraeus USA is a dental desensitizer composition used for treatment of hypersensitive dentine.   The GLUMA dental desensitizer product composition is: (2-hydroxyethyl) methacrylate • glutardialdehyde • purified water (the "USA GLUMA Product).

**RESPONSE:**   Plaintiff admits the allegations.

18.   The USA GLUMA product is housed in a small, medicinal bottle containing 5 ml of the GLUMA composition.

**RESPONSE:**  Deny as stated as Defendant does identify exact Gluma product. Admitted, however, that Plaintiff makes a product housed in such a manner.

19.  The USA GLUMA product is packaged in a rectangular box, and in the box is included product literature.

**RESPONSE:**  Deny as stated as Defendant does identify exact Gluma product. Admitted, however, that Plaintiff makes a product package in this manner.

20.  The USA GLUMA product is manufactured by Heraeus Germany.

**RESPONSE:** Admit.

21.  The USA GLUMA product literature provides "instructions for use" in at least 16 languages.

**RESPONSE:**  Deny as stated as Defendant does identify exact Gluma product. Admitted, however, that Plaintiff makes a with such literature.

22.  The USA GLUMA product rectangular box has writing thereon describing the contents in more than ten languages.

**RESPONSE:**  Deny as stated as Defendant does identify exact Gluma product. Admitted, however, that Plaintiff makes a product housed in such a box.

23.  The USA GLUMA product box has the marking: CE 0197, which is a European manufacturing standard and the statement "made in Germany."

**RESPONSE:**  Deny as stated as Defendant does identify exact the specific box. Admitted, however, that Plaintiff makes a product with such markings.

24.  Heraeus Germany produces a GLUMA product for the China market ("China GLUMA product").

**RESPONSE:** Admit.

25.    The China GLUMA product has a composition identical to that of USA GLUMA product sold by Heraeus USA.

**RESPONSE:**  Admit.

26.    The China GLUMA product bottle is identical in size and overall shape to the bottle of the USA GLUMA product.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

27.    The China GLUMA product is sold in a paper box marked with Chinese and English writing, and the English writing includes:  "Heraeus Kulzer GmbH"; http://heraeus-kulzer.com.cn; GLUMA ® Desensitizer"; and the Heraeus Kulzer company "trademark and log".

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

28.    The Heraeus China GLUMA product includes product literature inside its paper box, including a description of the composition of the product and instruction for use, in the English language.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

29.    The China GLUMA product states that it is manufactured subject to the ISO 9001 standard and was made by "Heraeus Kulzer," which is Heraeus German.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

30.     The Heraeus China GLUMA desensitizer product has been on sale in the United Status for at least ten years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

31.     The Heraeus China GLUMA desensitizer product has been on sale in the United States for at least five years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

32.     Heraeus USA has been aware of the sale of the China GLUMA product in the United States for at least ten years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

33.     Heraeus USA has been aware of the sale of the China GLUMA product in the United States for at least five years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

34.     Heraeus USA has never received a complaint or expression of confusion involving the Heraeus China GLUMA product from any dentist located outside Massachusetts who purchased the China GLUMA product.

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

35.     Heraeus USA sells, under the CHARISMA trademark, a syringe refill described as being a "universal light-curing hybrid composite, radio-opaque" (the "USA Charisma syringe").

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

36.     Heraeus Germany manufactures an identical Charisma syringe for the China market (the "China Charisma syringe").

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

37.     Heraeus Germany manufactures a Charisma syringe for sale in the European market (the "European Charisma syringe").

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

38.     The USA Charisma syringe is sold in a Charisma USA box and accompanied by Heraeus literature.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

39.     The European Charisma syringe is sold in a box and accompanied by Heraeus literature.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

40.     The literature in both the European Charisma box and in the USA Charisma box are identical, and both the USA Charisma box and the European Charisma box have writings in multiple languages.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

41.     The Heraeus China Charisma syringe is sold in a box with writing in English, including: "universal light-curing microglass composite for anterior and posterior teeth" and "resin-based dental restorative material, light-curing" and "made by Heraeus Kulzer", and "4g syringe."

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

42.    The Charisma product composition in the CHARISMA syringes sold in the United States, in the European market and in China, are identical.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

43.    Heraeus USA never received complaints from any dentists customers the China or European Charisma syringes, other than as described in the Amended Complaint in this action.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

44.    Heraeus USA has been aware of the sale and distribution I n the United States of Heraeus Charisma brand syringes, other than those being sold by Heraeus USA for a period of at least five years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

45.    Heraeus USA has been aware of the sale and distribution in the United States of Heraeus Charisma brand syringes, other than those being sold by Heraeus USA for a period of at least three years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

46.    All of the Omni products accused of being trademark infringements of Heraeus trademarks in this lawsuit have been produced by or for and/or with the authorization of either Heraeus Germany and/or Heraeus USA.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

47.    As of the date that if filed the  instant Amended Complaint, Heraeus USA has never seen any physical or documentary evidence of any sale by Omni of an iBOND product imported into the United States, by an entity other than Heraeus USA.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

48.    All of the Omni products accused of being trademark infringements of Heraeus trademarks in this lawsuit have been produced by or for and/or with the authorization of either Heraeus Germany and/or Heraeus USA.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

49.    As of the date that if filed the Amended Complaint, Heraeus USA has never seen any physical or documentary evidence of any sale by Omni of an DURAFILL product imported into the United States, by an entity other than Heraeus USA.

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

50. For each accused product in this lawsuit, Heraeus Germany was involved and received monetary compensation for the original sale of every such product.

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

51. Heraeus USA has been aware for at least ten years of the sale and distribution in the United States of one or more of Heraeus GLUMA, CHARISMA, iBOND and DURAFILL products, which have not originated from Heraeus USA.

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

52. Heraeus USA has been aware for at least five years of the sale in the United States of any of GLUMA, CHARISMA, iBOND and DURAFILL products, which have not originated from Heraeus USA.

**RESPONSE:** Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

53. Heraeus Germany has been aware for at least ten years of the sales and distribution in the United States of one or more of Heraeus GLUMA, CHARISMA, iBOND and DURAFILL products, which have not originated from Heraeus USA.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

54.    Heraeus Germany has been aware for at least five years of sale in the United States of any of GLUMA, CHARISMA, iBOND and DURAFILL products, which have not originated from Heraeus USA.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

55.    The instant lawsuit is the first lawsuit by Heraeus USA against anyone which asserts trademark infringement of the GLUMA, CHARISMA, iBOND and/or DURAFILL trademarks in the United States during the last ten years.

**RESPONSE:**  Plaintiff objects as the request exceeds the number of allowed requests for admissions under Rule 26.1(C) of the Local Rules of the United States District Court for the District of Massachusetts.

HERAEUS KULZER, LLC,

By Its Attorney,

Morgan T. Nickerson (BBO# 667290)
Email: morgan.nickerson@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
One Post Office Square / 30th Floor
Boston, MA  02109
(617) 573-4700

Dated: February 19, 2013



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | *eBusiness* | eBiz alerts | News | Help



**Assignments on the Web** > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

| | | | |
|---|---|---|---|
| **Serial #:** 73577476 | **Filing Dt:** 01/13/1986 | **Reg #:** 1402838 | **Reg. Dt:** 07/29/1986 |

**Registrant:** BAYER AKTIENGESELLSCHAFT

**Mark:** GLUMA

## Assignment: 1

| | | | |
|---|---|---|---|
| **Reel/Frame:** 1440/0648 | **Received:** 03/22/1996 | **Recorded:** 03/15/1996 | **Pages:** 5 |

**Conveyance:** ASSIGNS THE ENTIRE INTEREST

**Assignor:** BAYER AKTIENGESELLSCHAFT

  **Exec Dt:** 02/08/1996
  **Entity Type:** JOINT STOCK COMPANY
  **Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH & CO. KG

  **Entity Type:** GERMAN LIMITED PARTNERSHIP
  **Citizenship:** NONE

HERAEUSSTRASSE 12-14

63450 HANAU, GERMANY

**Correspondent:** CONNOLLY AND HUTZ

JOHN D. FAIRCHILD

P.O. BOX 2207

1220 MARKET BUILDING

WILMINGTON, DE 19899

**Domestic rep:** CONNOLLY AND HUTZ

1220 MARKET BUILDING

P.O. BOX 2207

WILMINGTON, DE 19899

## Assignment: 2

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3209/0614 | **Received:** 08/22/2005 | **Recorded:** 08/18/2005 | **Pages:** 6 |

**Conveyance:** CHANGE OF NAME

**Assignor:** HERAEUS KULZER GMBH & CO. KG

  **Exec Dt:** 08/26/2004
  **Entity Type:** COMPANY
  **Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH

  **Entity Type:** COMPANY
  **Citizenship:** GERMANY

GRUENER WEG 11

D-63450 HANAU, GERMANY

**Correspondent:** NATHANIEL D. KRAMER, ESQ.

KIRSCHSTEIN, OTTINGER, ISRAEL &

SCHIFFMILLER, P.C.

489 FIFTH AVENUE

NEW YORK, NEW YORK 10017

Search Results as of: 03/24/2013 12:13 PM



## United States Patent and Trademark Office



Home | Site Index | Search | Guides | Contacts | *eBusiness* | eBiz alerts | News | Help

**Assignments on the Web** > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 2**

| | | | |
|---|---|---|---|
| **Serial #:** 74801378 | **Filing Dt:** 02/22/1991 | **Reg #:** 1816611 | **Reg. Dt:** 01/18/1994 |

**Registrant:** Heraeus Kulzer GmbH
**Mark:** CHARISMA

## Assignment: 1

| | | | |
|---|---|---|---|
| **Reel/Frame:** 1932/0703 | **Received:** 07/23/1999 | **Recorded:** 07/16/1999 | **Pages:** 7 |

**Conveyance:** ASSIGNS THE ENTIRE INTEREST

**Assignor:** HERAEUS KULZER GMBH

**Exec Dt** 07/01/1999
**Entity Type:** CORPORATION
**Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH & CO. KG.

D-63450 HANAU, GERMANY

**Entity Type:** CORPORATION
**Citizenship:** GERMANY

**Correspondent:** SPRUNG KRAMER SCHAEFER & BRISCOE

NATHANIEL D. KRAMER, ESQ.

120 WHITE PLAINS ROAD, SUITE 202

TARRYTOWN, NEW YORK 10591

## Assignment: 2

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3209/0614 | **Received:** 08/22/2005 | **Recorded:** 08/18/2005 | **Pages:** 6 |

**Conveyance:** CHANGE OF NAME

**Assignor:** HERAEUS KULZER GMBH & CO. KG

**Exec Dt** 08/26/2004
**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH

GRUENER WEG 11

D-63450 HANAU, GERMANY

**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Correspondent:** NATHANIEL D. KRAMER, ESQ.

KIRSCHSTEIN, OTTINGER, ISRAEL &

SCHIFFMILLER, P.C.

489 FIFTH AVENUE

NEW YORK, NEW YORK 10017

Search Results as of: 03/24/2013 12:16 PM

If you have any comments or questions concerning the data displayed, contact PRD / Assignments at . v.2.3.2
Web interface last modified: July 10, 2012 v.2.3.2

| **HOME** | **INDEX** | **SEARCH** | *eBUSINESS* | **CONTACT US** | **PRIVACY STATEMENT** |

http://assignments.uspto.gov/assignments/q?db=tm&qt=sno&reel=&frame=&sno=74801378[3/24/2013 12:16:56 PM]



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | *eBusiness* | eBiz alerts | News | Help



**Assignments on the Web** > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 8**

| | | | |
|---|---|---|---|
| **Serial #:** 73318983 | **Filing Dt:** 07/14/1981 | **Reg #:** 1212910 | **Reg. Dt:** 10/19/1982 |

**Registrant:** Kulzer & Co., GmbH
**Mark:** DURAFILL

## Assignment: 1

| | | | |
|---|---|---|---|
| **Reel/Frame:** 0539/0065 | **Received:** | **Recorded:** 09/29/1986 | **Pages:** 5 |

**Conveyance:** ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL

**Assignor:** KULZER & CO. GMBH

**Exec Dt:** 09/16/1986
**Entity Type:** CORPORATION
**Citizenship:** GERMANY

**Assignee:** KULZER ,INC.
UNIT G.
10005 MUIRLANDS BLVD.
IRVINE, CALIFORNIA 92714

**Entity Type:** CORPORATION
**Citizenship:** CALIFORNIA

**Correspondent:** KNOBBE, MARTENS, ET AL.
SUITE 1600, 610 NEWPORT CENTER DRIVE
NEWPORT BEACH, CA 92660

## Assignment: 2

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2554/0531 | **Received:** 08/05/2002 | **Recorded:** 07/30/2002 | **Pages:** 2 |

**Conveyance:** ASSIGNMENT OF AN UNDIVIDED PART OF ASSIGNORS INTEREST

**Assignor:** KULZER, INC.

**Exec Dt:** 11/01/1991
**Entity Type:** CORPORATION
**Citizenship:** CALIFORNIA

**Assignee:** HERAEUS KULZER, INC.
UNIT G
10005 MUIRLANDS BOULEVARD
IRVINE, CALIFORNIA 92714

**Entity Type:** CORPORATION
**Citizenship:** CALIFORNIA

**Correspondent:** KIRSCHSTEIN, OTTINGER, ISRAEL ET AL.
NATHANIEL D. KRAMER, ESQ.
489 FIFTH AVENUE
SUITE 17
NEW YORK, NY 10017

## Assignment: 3

| | | | |
|---|---|---|---|
| **Reel/Frame:** 0886/0226 | **Received:** | **Recorded:** 07/24/1992 | **Pages:** 3 |

**Conveyance:** CHANGE OF NAME 19900927

**Assignor:** KULZER GMBH

**Exec Dt:** 06/11/1992
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

| | |
|---|---|
| **Assignee:** HERAEUS KULZER GMBH | **Entity Type:** CORPORATION |
| HANAU, GRUNER WEG 11 | **Citizenship:** GERMANY |
| FEDERAL REPUBLIC OF GERMANY | |
| **Correspondent:** NATHANIEL D. KRAMER | |
| SPRUNG, HORN, KRAMER & WOODS | |
| 120 WHITE PLAINS ROAD | |
| TARRYTOWN, NEW YORK 10591 | |

## Assignment: 4

| | | | |
|---|---|---|---|
| **Reel/Frame:** 1932/0703 | **Received:** 07/23/1999 | **Recorded:** 07/16/1999 | **Pages:** 7 |
| **Conveyance:** ASSIGNS THE ENTIRE INTEREST | | | |
| **Assignor:** HERAEUS KULZER GMBH | | **Exec Dt:** 07/01/1999 | |
| | | **Entity Type:** CORPORATION | |
| | | **Citizenship:** GERMANY | |
| **Assignee:** HERAEUS KULZER GMBH & CO. KG. | | **Entity Type:** CORPORATION | |
| D-63450 HANAU, GERMANY | | **Citizenship:** GERMANY | |
| **Correspondent:** SPRUNG KRAMER SCHAEFER & BRISCOE | | | |
| NATHANIEL D. KRAMER, ESQ. | | | |
| 120 WHITE PLAINS ROAD, SUITE 202 | | | |
| TARRYTOWN, NEW YORK 10591 | | | |

## Assignment: 5

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2554/0536 | **Received:** 08/05/2002 | **Recorded:** 07/30/2002 | **Pages:** 5 |
| **Conveyance:** MERGER | | | |
| **Assignor:** HERAEUS KULZER. INC. | | **Exec Dt:** 01/01/2001 | |
| | | **Entity Type:** CORPORATION | |
| | | **Citizenship:** CALIFORNIA | |
| **Assignee:** J.F. JELENKO & CO. A DELAWARE CORPORATION | | **Entity Type:** CORPORATION | |
| 99 BUSINESS PARK DRIVE | | **Citizenship:** NONE | |
| ARMONK, NEW YORK 10504 | | | |
| **Correspondent:** KIRSCHSTEIN, OTTINGER, ISRAEL ET AL. | | | |
| NATHANIEL D. KRAMER, ESQ. | | | |
| 489 FIFTH AVENUE | | | |
| SUITE 17 | | | |
| NEW YORK, NY 10017 | | | |

## Assignment: 6

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2554/0541 | **Received:** 08/05/2002 | **Recorded:** 07/30/2002 | **Pages:** 5 |
| **Conveyance:** CHANGE OF NAME | | | |
| **Assignor:** J.F. JELENKO & CO. | | **Exec Dt:** 01/01/2001 | |
| | | **Entity Type:** CORPORATION | |
| | | **Citizenship:** DELAWARE | |
| **Assignee:** HERAEUS-KULZER. INC. | | **Entity Type:** CORPORATION | |
| 99 BUSSINESS PARK DRIVE | | **Citizenship:** DELAWARE | |
| ARMONK, NEW YORK 10504 | | | |
| **Correspondent:** KIRSCHSTEIN, OTTINGER, ISRAEL ET AL. | | | |
| NATHANIEL D. KRAMER, ESQ. | | | |
| 489 FIFTH AVE. | | | |
| STE. 17 | | | |

NEW YORK, NY 10017

## Assignment: 7

| | | | |
|---|---|---|---|
| **Reel/Frame:** 2554/0842 | **Received:** 08/05/2002 | **Recorded:** 07/30/2002 | **Pages:** 3 |

**Conveyance:** NUNC PRO TUNC ASSIGNMENT

**Assignor:** HERAEUS-KULZER, INC.

**Exec Dt:** 01/01/2001
**Entity Type:** CORPORATION
**Citizenship:** DELAWARE

**Assignee:** HERAEUS KULZER GMBH & CO. KG
GRUENER WEG 11
D-63450 HANAU, GERMANY

**Entity Type:** UNKNOWN
**Citizenship:** NONE

**Correspondent:** KIRSCHSTEIN, OTTINGER, ISRAEL ET AL.
NATHANIEL D. KRAMER, ESQ.
489 FIFTH AVENUE
SUITE 17
NEW YORK, NY 10017

## Assignment: 8

| | | | |
|---|---|---|---|
| **Reel/Frame:** 3209/0614 | **Received:** 08/22/2005 | **Recorded:** 08/18/2005 | **Pages:** 6 |

**Conveyance:** CHANGE OF NAME

**Assignor:** HERAEUS KULZER GMBH & CO. KG

**Exec Dt:** 08/26/2004
**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH
GRUENER WEG 11
D-63450 HANAU, GERMANY

**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Correspondent:** NATHANIEL D. KRAMER, ESQ.
KIRSCHSTEIN, OTTINGER, ISRAEL &
SCHIFFMILLER, P.C.
489 FIFTH AVENUE
NEW YORK, NEW YORK 10017

Search Results as of: 03/27/2013 10:41 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at . v.2.3.2
Web interface last modified: July 10, 2012 v.2.3.2



## United States Patent and Trademark Office

Home | Site Index | Search | Guides | Contacts | *eBusiness* | eBiz alerts | News | Help



**Assignments on the Web** > Trademark Query

# Trademark Assignment Abstract of Title

**Total Assignments: 1**

| | | | |
|---|---|---|---|
| **Serial #:** 76470146 | **Filing Dt:** 11/12/2002 | **Reg #:** 2816440 | **Reg. Dt:** 02/24/2004 |

**Registrant:** Heraeus Kulzer GmbH & Co. KG

**Mark:** IBOND

**Assignment: 1**

| | | |
|---|---|---|
| **Reel/Frame:** 3209/0614 | **Received:** 08/22/2005 | **Recorded:** 08/18/2005 | **Pages:** 6 |

**Conveyance:** CHANGE OF NAME

**Assignor:** HERAEUS KULZER GMBH & CO. KG

**Exec Dt:** 08/26/2004
**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Assignee:** HERAEUS KULZER GMBH

GRUENER WEG 11

D-63450 HANAU, GERMANY

**Entity Type:** COMPANY
**Citizenship:** GERMANY

**Correspondent:** NATHANIEL D. KRAMER, ESQ.

KIRSCHSTEIN, OTTINGER, ISRAEL &

SCHIFFMILLER, P.C.

489 FIFTH AVENUE

NEW YORK, NEW YORK 10017

Search Results as of: 03/27/2013 10:44 AM
If you have any comments or questions concerning the data displayed, contact PRD / Assignments at . v.2.3.2
Web interface last modified: July 10, 2012 v.2.3.2

| HOME | INDEX | SEARCH | *e*BUSINESS | CONTACT US | PRIVACY STATEMENT

# EXHIBIT 8

Heraeus | Corporate Information | Careers | Press | Core Competencies | Search ▶

Worldwide

Heraeus Dental North America

# Heraeus

› Home
› Company
› Corporate Social Responsibility
⌄ **Our Brands** ⌄
  **Dentistry** ⌄
    Venus
    **GLUMA**
    iBOND
    Flexitime
    AGFA
    Charisma
    Ivory
    Laboratory
› Our Products
› Heraeus Education
› Heraeus Literature
› Heraeus Dental 360 Newsletter
› Heraeus Opinion Leaders
› Heraeus Precious Metal Refining
› Heraeus Press Releases
› Our Partners
› Marketing Resources
› Promotions
› Contact
› Heraeus Product Information





## GLUMA

Under Every Restoration.™

### GLUMA® Desensitizer

Gluma is the most well-known and trusted desensitizer in the dental industry worldwide. Used in over 50 million restorations, Gluma is preferred over all others for eliminating dentinal hypersensitivity.

Just one drop of Gluma is all you need and the results are fast and effective. No mixing, no curing and no repetitive steps.

- For treating cervical hypersensitivity
- For use as pretreatment to priming and bonding in direct composite restorations
- For use as pretreatment prior to placing compomer or amalgam restorations
- Can be used with all bonding and restorative materials in any situation









### GLUMA® Desensitizer PowerGel

With the same proven efficacy as Gluma® Desensitizer, Gluma® Desensitizer PowerGel is a unique one-step gel formula desensitizer that allows for greater control and accuracy during application.

In addition, its unique green-color indicator provides visual ease of placement and rinse-clean capability.

- No agitation or light curing required makes it easy to use and saves time
- Can be used with all bonding and restorative materials, in any situation
- Provides greater control and accuracy during placement
- No-drip formula, so it stays where you place it, minimizing contact with soft tissues
- Green color indicator allows for easy visual placement and rinse-clean capability



| Doctors and Assistants | Hygienists |
|---|---|
| Use Gluma under every restoration — direct and indirect—to ensure your patients the comfort they deserve. | With the control of a gel and the confidence of Gluma, your patients will appreciate the fast, effective, and long-term results for a more comfortable prophy. |

| Under crowns | Cervical erosions |
|---|---|
| Bridges | Exposed dentin surface |
| Inlays and onlays | Gingival recession |
| Veneers and temporaries | |
| Margins around temporary crowns | |
| Under all direct restorations | |

**GLUMA® Comfort Bond and Desensitizer**

- Prime, Bond, and Desensitize in a Single No-Mix Step
- One bottle adhesive for priming, bonding, and desensitizing.
- Simple to use -- requires no mixing.
- Suitable for both moist and dry bonding techniques.
- Indicated for bonding direct fill light curing composite or compomer restorations.
- Bonding agent for indirect restorations (such as ceramic veneers, ceramic crowns, inlays and onlays) when used with light cure or dual cure luting cements.
- The only 5th generation adhesive to include Reality's Choice Five-Star award-winning Gluma Desensitizer.



© 2013 Heraeus Kulzer

GTC    Imprint    Privacy Policy    Disclaimer    Contact

Heraeus   |   Corporate Information   |   Careers   |   Press   |   Core Competencies   |   Search

Worldwide   Language

**Heraeus Dental China**

**Heraeus**

> Home

∨ Our Products

**Dentistry products** ∨

Agfa

Impression

**Preventive**

Composites

Adhesives

Etchants

Glass Ionomers Restoratives

Curing Lights

ENDO

Diamonds Bur

Carbide Bur

Other Dentistry

Laboratory products

> Heraeus Dental Science

> Downloads

> Press & News

> Company

> Customer Service

> Join Us

## Preventive

**Desensitizer**

GLUMA® DESENSITIZER

Gluma® has been in the market for more than a decade, and has been
used in over 50 million restorations worldwide to prevent hypersensitivity. The well-known international test institute "REALITY" has commended GLUMA Desensitizer by awarding it the Reality's choice five star award, the best grade.

• Fast and effective
• Easy application without mixing and curing
• Clinically proven efficacy for at least 12 months
• Intradentin effect, no surface film – therefore well suited to indirect restorations also



**Contact Us**

Add:No.1585 Gumei Road

Tel:

Fax:86 21 3357 5119

© 2013 Heraeus Kulzer

Imprint   Privacy Policy   Disclaimer   Contact

Heraeus   |   Corporate Information   |   Careers   |   Press   |   Core Competencies   |   ▶ Search

Worldwide

Heraeus Dental North America

# Heraeus

> Home
> Company
> Corporate Social Responsibility
⌄ Our Brands
  **Dentistry** ⌄
   Venus
   GLUMA
   **iBOND**
   Flexitime
   AGFA
   Charisma
   Ivory
   Laboratory
> Our Products
> Heraeus Education
> Heraeus Literature
> Heraeus Dental 360 Newsletter
> Heraeus Opinion Leaders
> Heraeus Precious Metal Refining
> Heraeus Press Releases
> Our Partners
> Marketing Resources
> Promotions
> Contact
> Heraeus Product Information





## iBOND® - Strong Reviews. Stronger Bonds.



Bonding with confidence
iBOND

**iBOND - Proven to Outperform the Market Leader.**

The iBOND brand provides customers with reliable, effective products for direct and indirect restorations.

The iBOND brand stands for **high, reliable bond strength** and is clinically proven to provide consistent results. iBOND offers **convenient handling** and **quick, easy application** as well as a **demonstrated reduction** in postoperative sensitivity.

### iBOND Self Etch

**iBond Self Etch** includes **etching, priming, bonding and desensitizing**, all **in one step**. It is the first real one-component-adhesive; all adhesive treatment steps are included in one component.

iBOND Self Etch simplifies the work of bonding with no need to mix. iBOND Self Etch is the **7th generation** one-step-bonding system, an innovative material with classical indications.

**Click here for more information on iBOND Self Etch.**



iBOND® Self Etch—
High initial bond strength

◀ Shear Bond Strength to Enamel and Dentin



iBOND® Self Etch—
High bond strength comparable with Total-Etch adhesives

μ-TBS to Dentin in Class I Cavities After 24 hrs Water Storage

Source: Dr. Marcus Hoffman Research & Development Heraeus Kulzer GmbH



Source: R. Frankenberger, University of Erlangen, Germany, 2006
μ-TBS=Micro Tear Bond Strength.

### iBOND Total Etch

iBOND® Total Etch is a new **Etch & Rinse 2-step bonding system** from Heraeus.

Due to the innovative nano-filler technology, iBOND Total Etch not only attains high bond strengths to both enamel

## Contact Us
Heraeus
Attn: Customer Service Center
300 Heraeus Way
South Bend, IN 46614
USA

**Phone:**
**Fax:** (800) 522-1545

**Email:**
customer.serviceHKNA
@heraeus.com

▶ **Contact Form**

## Information

▶ California Transparency in Supply Chains Act



and dentin but also ensures optimal marginal adaptation and is ideal for desensitizing hypersensitive areas.

**Click here for more information about iBOND Total Etch.**





**GLUMA Comfort Bond & Desensitizer**

Prime, bond, and desensitize in a single no-mix step with Gluma Comfort Bond & Desensitizer one bottle adhesive.

Simple to use -- requires no mixing. Suitable for both moist and dry bonding techniques.

Indicated for bonding direct fill light curing composite or compomer restorations.

When used with light cure or dual cure luting cements, can also be used for bonding indirect restorations (such as ceramic veneers, ceramic crowns, inlays and onlays).

The only 5th generation adhesive to include Reality's Choice Five-Star award-winning Gluma Desensitizer.



© 2013 Heraeus Kulzer

GTC    Imprint    Privacy Policy    Disclaimer    Contact

Heraeus | Corporate Information | Careers | Press | Core Competencies | Search

Worldwide    Language

**Heraeus Dental China**

# Heraeus

> Home
> ✓ Our Products
  > **Dentistry products** ˅
    - Agfa
    - Impression
    - Preventive
    - Composites
    - **Adhesives**
    - Etchants
    - Glass Ionomers Restoratives
    - Curing Lights
    - ENDO
    - Diamonds Bur
    - Carbide Bur
    - Other Dentistry
    - Laboratory products
> Heraeus Dental Science
> Downloads
> Press & News
> Company
> Customer Service
> Join Us

## Adhesives

### IBOND® SELF ETCH



iBOND Self Etch is an all-in-one adhesive that etches, primes, bonds, and desensitises in a single step. Clinically proven and based on Heraeus Kulzer long-term bonding experience, this 7th generation adhesive combines high bond strength, improved marginal sealing, and virtually no post-operative sensitivity with an easier, faster and more convenient application.
• Excellent marginal sealing
• High bond strength to enamel and dentine
• Easy, fast and safe application with only one coat
• Improved bottle nozzle enables a precise dosage and avoids dripping
• Etching, priming, bonding and desensitising in a single step
• Suitable for wet and dry bonding techniques
• long-lasting results in each restoration
• Available in Single Doses

### GLUMA® COMFORT BOND



GLUMA Comfort Bond can be classified as a "wet-bonding" adhesive. Because of its integrated 4-META bond enhancer and its hydroactive wetting capacity, it ensures long-term bonding between tooth and restoration, even in amalgam restorations.
• Total Etch adhesive in a single bottle for priming and bonding
• Easy application without mixing
• Suitable for wet and dry bonding techniques

**Contact Us**
Add:No.1585 Gumei Road
Tel:
Fax:86 21 3357 5119

© 2013 Heraeus Kulzer

Imprint    Privacy Policy    Disclaimer    Contact

# Exhibit 9

# Filed Under Seal

01308558.1

# EXHIBIT 10

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | | |
|---|---|---|
| Heraeus Kulzer LLC | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   12-cv-11099 (RGS) |
| Omni Dental Supply | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | District of Massachusetts        ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Heraeus Kulzer GmbH, Heraeus Metals NY LLC
    540 Madison Avenue, New York, New York 10022

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

SEE ATTACHMENT B

| Place: Ostrolenk Faber LLP<br>1180 Avenue of the Americas, 7th Floor<br>New York, NY  10036 | Date and Time:<br><br>03/19/2013 9:30 am |
|---|---|

    The deposition will be recorded by this method:   _stenographic/court reporter_

☐ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   _03/04/2013_

| | | |
|---|---|---|
| *CLERK OF COURT* | OR | |
| _____<br>*Signature of Clerk or Deputy Clerk* | | _____<br>*Attorney's Signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Omni Dental Supply
                                                   , who issues or requests this subpoena, are:

Max Moskowitz, Esq. (mmoskowitz@ostrolenk.com)
Ostrolenk Faber LLP, 1180 Avenue of the Americas, 7th Floor, New York, NY 10036
Tel. (212) 382-0700

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   12-cv-11099 (RGS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____   on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____                  _____
                                            *Server's signature*

                                         _____
                                            *Printed name and title*

                                         _____
                                            *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## ATTACHMENT B

1. Sales by Omni Dental Supply of dental products bearing at least one of the trademarks HERAEUS, GLUMA, CHARISMA, iBOND, and/or DURAFILL that have not been authorized for sale in the United States by either Heraeus Kulzer GmbH or Heraeus Kulzer LLC.

2. Sales by an entity other than Omni Dental Supply of dental products bearing at least one of the trademarks HERAEUS, GLUMA, CHARISMA, iBOND, and/or DURAFILL that have not been authorized for sale in the United States by either Heraeus Kulzer GmbH or Heraeus Kulzer LLC.

3. Communications between Heraeus Kulzer GmbH and the United States Customs and Border Protection agency relative to products that bear one or more of the trademarks HERAEUS, GLUMA, CHARISMA, iBOND, and/or DURAFILL.

4. Quality control exercised over the manufacture of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

5. Quality control exercised over the manufacture of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

6. Composition and formulation of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

7. Composition and formulation of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

8. Determinations made to fix prices and price levels of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

9. Determinations made to fix prices and price levels of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

10. Determinations made for packaging and labeling Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

11. Determinations made for packaging and labeling Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

12. Determination made to grant Heraeus Kulzer LLC exclusive distributions rights in the United States for Heraeus Kulzer GmbH manufactured Heraeus Kulzer trademarked products.

13.     Determination made to grant Heraeus Kulzer LLC exclusive distributions rights in markets other than the United States for Heraeus Kulzer GmbH manufactured Heraeus Kulzer trademarked products.

14.     Negotiations between Heraeus Kulzer GmbH and Heraeus Kulzer LLC relating to the sale of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

15.     Negotiations between Heraeus Kulzer GmbH and Shanghai Heraeus Kulzer Dental Trading Ltd. relating to the sale of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

16.     Negotiations between Heraeus Kulzer GmbH and Heraeus Kulzer Dental Ltd. relating to the sale of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products intended for distribution in China.

17.     Policing by Heraeus Kulzer GmbH of the distribution of Heraeus Kulzer Charisma and Gluma Desensitizer Standard products in markets in which they are not intended to be distributed.

18.     Corporate organization of Heraeus Kulzer GmbH.

19.     Organization, management and structure of Heraeus Kulzer Dental Division.

20.     Units of Charisma shipped and unit price at which Charisma was sold to Shanghai Heraeus Kulzer Dental Trading Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

21.     Units of Charisma shipped and unit price at which Charisma was sold to Heraeus Kulzer Dental Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

22.     Units of Charisma shipped and unit price at which Charisma was sold to Heraeus Kulzer LLC. by Heraeus Kulzer GmbH for each calendar year from 2009 through 2012.

23.     Units of Gluma Desensitizer Standard shipped and unit price at which Gluma Desensitizer Standard was sold to Shanghai Heraeus Kulzer Dental Trading Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

24.     Units of Gluma Desensitizer Standard shipped and unit price at which Gluma Desensitizer Standard was sold to Heraeus Kulzer Dental Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

25.  Units of Gluma Desensitizer Standard shipped and unit price at which Gluma Desensitizer Standard was sold to Heraeus Kulzer LLC. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

26.  Control exercised by Heraeus Kulzer GmbH over Heraeus Kulzer LLC.

27.  Control exercised by Heraeus Kulzer GmbH over Shanghai Heraeus Kulzer Dental Trading Ltd.

28.  Control exercised by Heraeus Kulzer GmbH over Heraeus Kulzer Dental Ltd.

29.  Control exercised by Heraeus Kulzer GmbH over Heraeus Kulzer Dental Division.

30.  Decisions relating to the determination of packaging and labeling for Charisma and Gluma Desensitizer Standard products intended for distribution in China.

31.  Decisions relating to the determination of packaging and labeling for Charisma and Gluma Desensitizer Standard products intended for distribution in the United States.

32.  Communications and negotiations with the United States Patent and Trademark Office relating to the registration of trademarks of which Heraeus Kulzer GmbH is identified to be the owner of the trademark registration.

33.  Communications with the United States Customs and Border Protections relating to differences between Heraeus Kulzer Charisma and Gluma Desensitizer Standard products imported into and sold in the United States and such products distributed and sold by Heraeus Kulzer GmbH elsewhere, including China.

34.  Capability of tracing the companies to whom Heraeus Kulzer GmbH distributes Heraeus Kulzer dental products, including Charisma and Gluma Desensitizer Standard, and the distribution of such dental products afterwards by these companies to other companies.

35.  Companies to whom Heraeus Kulzer GmbH's Charisma and Gluma Desensitizer Standard products have been shipped which were initially intended for distribution to China, including companies to which shipment was authorized and not.

AO 88B  (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| Heraeus Kulzer LLC | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   12-cv-11099 (RGS) |
| Omni Dental Supply | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | District of Massachusetts            ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Heraeus Kulzer GmbH, Heraeus Metals NY LLC
    540 Madison Avenue, New York, New York 10022

  ☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:
      See Attachment A.

| Place:  Ostrolenk Faber LLP<br>1180 Avenue of the Americas, 7th Floor<br>New York, NY  10036 | Date and Time:<br><br>03/18/2013 10:00 am |
|---|---|

  ❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

    The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  03/04/2013

| *CLERK OF COURT* | | OR | |
|---|---|---|---|
| _____ | | | _____ |
| *Signature of Clerk or Deputy Clerk* | | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Omni Dental Supply
                                  , who issues or requests this subpoena, are:

Max Moskowitz, Esq. (mmoskowitz@ostrolenk.com)
Ostrolenk Faber LLP, 1180 Avenue of the Americas, 7th Floor, New York, NY 10036
Tel. (212) 382-0700

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   12-cv-11099 (RGS)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____            _____
                                                          *Server's signature*

                                                 _____
                                                          *Printed name and title*

                                                 _____
                                                          *Server's address*

Additional information regarding attempted service, etc:

AO 88B  (Rev.  06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

# ATTACHMENT A

1.    All documents received or sent or authored by Heraeus Kulzer GmbH which mention Omni Dental Supply.

2.    All documents received or sent or authored by Heraeus Kulzer GmbH which mention or concern sales in the United States of Gray Market and/or unauthorized dental products manufactured by Heraeus Kulzer GmbH.

3.    All documents received or sent or authored by Heraeus Kulzer GmbH and involving the United States Customs and Border Protection agency.

4.    All documents showing the composition or formulation of Heraeus Kulzer Charisma being manufactured or distributed by Heraeus Kulzer GmbH to Heraeus Kulzer LLC is different in composition or formulation from Heraeus Kulzer Charisma being manufactured or distributed by Heraeus Kulzer GmbH to Shanghai Heraeus Kulzer Dental Trading Ltd. and/or Heraeus Kulzer Dental Ltd.

5.    All documents showing the composition or formulation of Heraeus Kulzer Charisma being manufactured or distributed by Heraeus Kulzer GmbH to Heraeus Kulzer LLC is different in composition or formulation from Heraeus Kulzer Charisma being manufactured or distributed by Heraeus Kulzer GmbH to Shanghai Heraeus Kulzer Dental Trading Ltd. and/or Heraeus Kulzer Dental Ltd.

6.    All documents showing the composition or formulation of Heraeus Kulzer Gluma Desensitizer Standard being manufactured or distributed by Heraeus Kulzer GmbH to Heraeus Kulzer LLC is different in composition or formulation from Heraeus Kulzer Gluma Desensitizer Standard being manufactured or distributed by Heraeus Kulzer GmbH to Shanghai Heraeus Kulzer Dental Trading Ltd. and/or Heraeus Kulzer Dental Ltd.

7.    All documents showing the exercise of quality control over the manufacture of Heraeus Kulzer Gluma Desensitizer Standard by Heraeus Kulzer GmbH being distributed to Heraeus Kulzer LLC is different from that for Heraeus Kulzer Gluma Desensitizer Standard being distributed by Heraeus Kulzer GmbH to Shanghai Heraeus Kulzer Dental Trading Ltd. and/or Heraeus Kulzer Dental Ltd.

8.    All documents showing the exercise of quality control over the manufacture of Heraeus Kulzer Charisma by Heraeus Kulzer GmbH being distributed to Heraeus Kulzer LLC is different from that for Heraeus Kulzer Charisma being distributed by Heraeus Kulzer GmbH to Shanghai Heraeus Kulzer Dental Trading Ltd. and/or Heraeus Kulzer Dental Ltd.

9.    All documents showing the corporate organization and officer and manager reporting functions for Heraeus Kulzer GmbH.

10.  All documents showing the corporate organization and officer and manager reporting functions for Heraeus Kulzer Dental Division.

11.  All document showing the units of Heraeus Kulzer Charisma shipped and unit price at which it was sold to Heraeus Kulzer LLC by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

12.  All document showing the units of Heraeus Kulzer Charisma shipped and unit price at which it was sold to Shanghai Heraeus Kulzer Dental Trading Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

13.  All document showing the units of Heraeus Kulzer Charisma shipped and unit price at which it was sold to  Heraeus Kulzer Dental Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

14.  All document showing the units of Heraeus Kulzer Gluma Desensitizer Standard shipped and unit price at which it was sold to Heraeus Kulzer LLC by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

15.  All document showing the units of Heraeus Kulzer Gluma Desensitizer Standard shipped and unit price at which it was sold to Shanghai Heraeus Kulzer Dental Trading Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

16.  All document showing the units of Heraeus Kulzer Gluma Desensitizer Standard shipped and unit price at which it was sold to  Heraeus Kulzer Dental Ltd. by Heraeus Kulzer GmbH or anyone authorized by it for each calendar year from 2009 through 2012.

17.  All documents showing the policing by Heraeus Kulzer GmbH of Heraeus Kulzer dental products for purposes of assuring the distribution of such products to their intended geographic markets and such products are not otherwise distributed to geographic markets elsewhere.

18.  All documents relating to negotiations of Heraeus Kulzer GmbH with Heraeus Kulzer LLC setting the prices at which it will sell Heraeus Kulzer LLC Heraeus Kulzer dental products, including Charisma and Gluma Desensitizer Standard.

19.  All documents showing the control exercised by Heraeus Kulzer GmbH over Heraeus Kulzer LLC.

20.  All documents showing any arrangement Heraeus Kulzer GmbH made with any company, with the exception of Heraeus Kulzer LLC, to distribute Heraeus Kulzer dental products in the United States or North America.

{01432580.1}

21.    All documents showing sales by Heraeus Kulzer GmbH of Heraeus Kulzer dental products to any company in the United States or North America, with the exception of Heraeus Kulzer LLC.

22.    All documents showing the capability of Heraeus Kulzer GmbH tracing and learning the identity of the companies to whom Heraeus Kulzer dental products, including Charisma and Gluma Desensitizer Standard, intended for distribution to China were shipped from 2009 through 2012,

23.    All documents showing the identities of companies to which Heraeus Kulzer GmbH's Charisma and Gluma Desensitizer Standard products intended for distribution to China were shipped, including companies to which shipment was authorized and not.

# EXHIBIT 11

# GERMAN AMERICAN
# TRADE



**SEP / OCT 2010**

## MAIKE SCHUH-KLAEREN
### President at Heraeus, Inc.

German Food in the US:
GACCs become Official
Export Partner

Washington State:
Innovation is
in our Nature

Dreamcatcher Series:
Marc Kleinmann
Designs Beautiful
& Sustainable Homes



**AHK** German American
Chambers of Commerce
Deutsch-Amerikanische
Handelskammern

GACC • 75 Broad Street, 21st Floor • New York, NY 10004 • USA

# Heraeus in the USA

## *An active presence for more than 50 years*

**W**hen Maike Schuh-Klaeren arrived in New York in April 2009, she was on a mission. As new President of Heraeus Inc., she established a new "Regional Center" – only one of two worldwide, one in New York, the other in Shanghai, catering to the needs of an international company.

What is the key function of a Regional Center? Above all, the Center performs a service role, acting as a link between the headquarters, located in Hanau, Germany and the local companies in the US. To begin with, the Regional Center supports the operating units on topics of strategic importance to the Heraeus Group, for example commercial law, corporate law, finance, taxes, IT, HR benefits, staff development and human resource marketing. In a second phase, such functions as accounting and external communications would be added.

"One reason for creating a shared service environment was to promote more of a 'one company' mindset," says Maike Schuh-Klaeren. Acting as one company

provides increased flexibility to all the business' operations while allowing corporate leaders to maintain a global perspective and simultaneously allowing regional-specific business unit leaders to focus on addressing the needs of their local customers.

By coordinating topics that are important to the Heraeus Group locally in the USA, internal processes can be improved. Therefore, the Regional Center can also contribute to implementing compliance guidelines in the US and ensuring that Heraeus presents a consistent face and is seen as an attractive employer throughout the USA.

One of the first objectives of the Regional Center was centralizing legal and corporate responsibilities. In addition, the Regional Center has made significant progress in the area of consolidation for finance and human resources. Payroll processing and employee benefit consolidation are examples of two value-added shared services. Also, US employees benefit from shared learning and development programs and greater exposure to career opportunities through shared recruiting resources.

Maike Schuh-Klaeren: "All our North American General Man-

**Maike Schuh-Klaeren**
President at Heraeus Inc.

Maike Schuh-Klaeren started her career in the international tax department of a Big Four accounting firm and joined Heraeus in 2002, where she was responsible for international taxes for the Heraeus Group.

On April 1, 2009, after working as Vice President for Corporate Projects, she took over the leadership of the Heraeus Regional Center in New York as its President. In this role, she reports directly to the Heraeus Holding Board of Management. In addition, she is also serving as Treasurer for the US Group.

Ms. Schuh-Klaeren holds both a law degree of the University of Trier and an MBA degree of Business Schools Mannheim and ESSEC Paris.

agers and our CFO, Jan Rinnert from Heraeus Holding and I meet every quarter at a different facility. This allows our managers to stay familiar with all the other business unit's challenges and working environments. Our meetings serve as both a review of current regional center projects and a sounding board for future projects."

## Globally Active and Family-Owned for over 155 Years

Businesses: precious metals, materials and technologies, sensors, biomaterials and medical products as well as dental products, quartz glass, and specialty light sources. With product revenues of 2.6 billion euros and precious metal trading revenues of 13.6 billion euros, as well as more than 12,300 employees in over 110 subsidiaries worldwide, Heraeus holds a leading position in its global markets.

Traditional yet forward thinking, Heraeus became an international company early on. Decades ago, as a way of spreading risk, the company pursued the goal of broad-based global activity, in Europe, in the United States and Asia. The first steps toward an international presence were taken throughout the Group in the early 1950s with forays into the US market.

The world's largest economy is now one of the Group's most

# Heraeus

important markets. Over the years, the major players in the United States have engaged in rounds of brisk competition for market share. Heraeus has managed to establish a strong position, as evidenced, for example, by the acquisition in the Medical Components Division of Heraeus.

All Heraeus business groups have subsidiaries in the United States. Almost 1,800 employees work in Heraeus facilities across the country, contributing $555 million to the Group's product revenues. The US companies export approximately 20 percent of what they produce, selling the bulk of their products to customers in the domestic market.



**CONTACT INFO**

**Heraeus Incorporated**

540 Madison Avenue, 16th Floor
New York, NY 10022

**Tel. 212-752-2705**
Fax 212-752-4686
info@heraeus.com

**www.heraeus.com**

003    **>>**

# Heraeus in the USA

ST. PAUL & LINO LAKES, MINNESOTA



**Heraeus Medical Components LLC**
**Year Established as part of Heraeus:** 2004 and 2008
**Site Operations:** We develop, design, prototype, and manufacture medical assemblies, components, and stamped housings.

### MERRILLVILLE, INDIANA



**Heraeus Electro-Nite Co., LLC**
**Year Established as part of Heraeus:** 1984
**Site Operations:** Service of repairing for the immersion lances and calibrating and repairing the instruments.

### PERU, INDIANA



**Heraeus Electro-Nite Co., LLC**
**Year Established as part of Heraeus:** 1990
**Site Operations:** Distribution of metal sensors.

### SANTA FE SPRINGS, CALIFORNIA



**Heraeus Metal Processing, LLC (HMP)**
**Year Established as part of Heraeus:** 2000
**Site Operations:** Development, design, prototyping and manufacturing of medical assemblies, components and stamped housings.

### CHANDLER, ARIZONA



**Heraeus Materials Technology, LLC**
**Year Established as part of Heraeus:** 1985
**Site Operations:** Sales, operations, administration, development, manufacturing and distribution of sputtering targets for the Magnetic Data Storage, Large Area Coatings and Electronics markets.

### BUFORD, GEORGIA



**Heraeus Tenevo LLC and**
**Heraeus Quartz America LLC**
**Year Established as part of Heraeus:** 1972
**Site Operations:** Production of fused quartz tubing for the fiber optics industry, distribution offices for the Optics, Base and Lamp divisions.

### AUSTIN, TEXAS

**Heraeus Quartz America, LLC (HQA)**
**includes 4 business units:** Fabrication (Austin, TX & Wilmington, NC), Base and Lamp Materials (Austin, TX), Standard Optics (Buford, GA)
**Year Established as part of Heraeus:** 1972
**Site Operations:** Fabrication is the only unit with US production sites (Austin and Wilmington, NC); Base, Lamp and Optics are sales only.

(as of December 31, 2009)

**No. of Employees in the USA:** 1751

| | |
|---|---|
| **Product Sales** | 555 Mio. Dollar |
| **PM Trading** | 5,6 Bil. Dollar |

## SOUTH BEND, INDIANA



**Heraeus Kulzer, LLC (HKNA)**
**Year Established as part of Heraeus:**
1995
**Site Operations:** Manufacturing and
distribution of dental business.

## LANGHORNE, PENNSYLVANIA



**Heraeus Electro-Nite Co., LLC**
**Year Established as part of
Heraeus:** 1988
**Site Operations:** Corporate US
headquarters of expendable
and semicontinous measuring
and sampling probes for molten
metal control, finance, sales,
IT, operations, customer
service, HR and R&D.

## NEWARK, NEW JERSEY



**Heraeus Precious Metals Management,**
**LLC, Refining Division (HPMM)**
**Year Established as part of Heraeus:** 1983
**Site Operations:** Precious metals recycling.

## NEW YORK, NEW YORK



**Heraeus Incorporated (Regional Center)**
**Year Established as part of Heraeus:** 1977
**Site Operations:** Corporate Management

**Heraeus Precious Metals Management LLC**
**Year Established as part of Heraeus:** 1989
**Site Operations:** Precious metals trading.

## NORTH BRUNSWICK, NEW JERSEY

**Heraeus Sensor Technology**
**Site Operations:** Distribution of
microstructured Thin- and Thick Film
systems.

## WARTBURG, TENNESSEE



**Heraeus Metal Processing, LLC (HMP)**
**Year Established as part of Heraeus:** 2000
**Site Operations:** Development, design,
prototyping and manufacturing of medical
assemblies, components and stamped
housings.

## ELLWOOD CITY, PENNSYLVANIA



**Heraeus Electro-Nite Co., LLC**
**Year Established as part of Heraeus:** 1988
**Site Operations:** Manufacture of
expendable sensors for basic metal
industries and foundries.

## W. CONSHOHOCKEN, PENNSYLVANIA



**Heraeus Materials Technology, LLC**
**Year Established as part of Heraeus:** 1981
**Site Operations:** Thick Film Business
Unit, Ceramic Colors and Solar Cell
Business Segment.

## WILMINGTON, NORTH CAROLINA



**Heraeus Quartz America, LLC**
Fabrication (Austin, TX & Wilmington, NC)
**Year Established as part
of Heraeus:** 1997
**Site Operations:** The division Fabrication
runs production sites in Austin, Texas and
Wilmington, North Carolina. Production of
quartzglass components for the
semiconductor- and telecommunication
industry.

## DULUTH, GEORGIA



**Heraeus Noblelight LLC (HNI)**
**Year established as part of Heraeus:**
since late 80s department of HQS, spin off
from HQS in 2001
**Site Operations:** Distribution of UV- and
IR-lamps in North and South America.

## PUERTO RICO



**Heraun Noblelight de Puerto
Rico, Inc. (HNPR)**
**Year Established as part of
Heraeus:** 2005
**Site Operations:** Production of
UV-lamps.



**Heraeus Materials Caribe (HMCC)**
**Year Established as part of
Heraeus:** 2008
**Site Operations:** Production of
medical components.

005

Case 1:13-cv-11099-RGS   Document 42-2   Filed 04/1

**Linked** **in** ® Account Type: Basic | Upgrade

Home    Profile    Contacts    Groups    Jobs    Inbox    Companies    News    More

People

**Philadelphia CEO Forum -** Join local business leaders and tackle your tough



# Maike Schuh-Klaeren

President at Heraeus Inc.

Greater New York City Area | Wholesale

| | |
|---|---|
| Previous | Heraeus Holding GmbH, KPMG |
| Education | ESSEC - ESSEC Business School |

**Send InMail** ▼

**139**
connections

 www.linkedin.com/pub/maike-schuh-klaeren/0/127/539/

## Background

### Experience

### President
Heraeus Inc.

April 2009 – Present (4 years 1 month) | New York

**Heraeus**

President and Treasurer, Heraeus Incorporated, New York, USA
Responsible for all corporate services in the North America,
Finance (Accounting, Treasury, Tax),
Legal and HR

Heraeus Incorporated is the Holding company for all Heraeus entities in the US, comprising 13 locations and more than 1,700 employees across the United States. Heraeus Incorporated also serves as the North American Corporate Center for corporate and shared services for Heraeus.

### Vice President Corporate Projects
Heraeus Holding GmbH

April 2008 – March 2009 (1 year)

**Heraeus**

### Senior Manager International Tax
Heraeus Holding GmbH

October 2006 – March 2008 (1 year 6 months)

### International Tax Manager
Heraeus Holding GmbH

December 2002 – May 20 **006** years 6 months)

Maike Schuh-Klaeren | LinkedIn



**Tax Lawyer**
KPMG
February 2001 – November 2002 (1 year 10 months)

Languages

**German**
Native or bilingual proficiency

**English**
Full professional proficiency

Skills & Expertise

Most endorsed for...

| 4 | Accounting |
| 3 | Corporate Finance |
| 1 | Restructuring |
| 1 | Budgets |
| 1 | Financial Reporting |
| 1 | Strategic Planning |

Corporate Law

Mergers

Auditing

Business Planning

Education

**ESSEC - ESSEC Business School**
Master, Business Education
2006 – 2008

MBA at ESSEC Mannheim

**Universität Trier**
Rechtsanwaeltin / Esq., Law
1993 – 1998

007

**Oranienschule**

Maike Schuh-Klaeren | LinkedIn



1987 – 1993

## Recommendations

Given (1)

**Phillip Hanefeld**
Senior Project Manager

❝ I have worked with Phillip on different projects and have always experienced him as very fast thinking, highly dynamic and absorbed in the projects. He has strong interpersonal skills and an inner drive toward performance and self improvement. It has always been a true pleasure to work with Phillip as he added real value on each of our projects. I would recommend Phillip... **more**

June 20, 2008, Maike was a consultant or contractor to Phillip at BASF Future Business GmbH

∨ See More ∨

## Groups

**ESSEC & MANNHEI...**
➕ Join

**ESSEC & Mannheim ...**
➕ Join

## Following

**Heraeus**
Wholesale
➕ Follow

Help Center    About    Press    Blog    Careers    Advertising    Talent Solutions    Tools    Mobile    Developers    Publishers    Language    Upgrade Your Account

LinkedIn Corporation © 2013    User Agreement  |  Privacy Policy  |  Community Guidelines  |  Cookie Policy  |  Copyright Policy  |  Send Feedback

008

Linked **in** ® Account Type: Basic | Upgrade

Home   Profile   Contacts   Groups   Jobs   Inbox   Companies   News   More        People ▼

**Philadelphia CEO Forum - Join local business leaders and tackle your tou**



# Kim Jessum

3rd

Associate General Counsel at Heraeus Incorporated

Greater Philadelphia Area | Legal Services

| | |
|---|---|
| Current | Heraeus, American Bar Association IP Law Section, Center City Residents' Association |
| Previous | Stradley Ronon, The Philadelphia Zoo, Rohm and Haas Company |
| Education | University of Pennsylvania |

**Connect**   **Send InMail** ▼

**500+**
connections

 www.linkedin.com/in/kimjessum/         Contact Info

**Background**

 Summary

I specialize in intellectual property and general matters including:
• preparing and negotiating license, secrecy, joint development and technology-transfer agreements
• developing and implementing patent strategies
• prosecuting U.S. and international patent applications
• providing freedom to operate, noninfringement and invalidity opinions
• managing U.S. and international patent portfolios, including performing technology evaluation and assessment
• supporting M&A transactions, including due diligence reviews and IP valuation
• managing intellectual property litigation
• advising on FDA issues

Specialties:Intellectual property matters including patent, trademark and copyright transactions and litigation.

Experience

### Associate General Counsel
Heraeus                                                    Heraeus
May 2012 – Present (1 year) | Greater Philadelphia Area

Counsel for manufacturing company with businesses in precious metals, materials and technologies, sensors, biomaterials, medical, dental, and pharmaceutical products, quartz glass, and specialty light sources in IP and general matters.

American Bar Association IP Law Section

August 2010 – Present (2 years 9 months)

**Director**

Center City Residents' Association

May 2012 – Present (1 year) | Greater Philadelphia Area

**Of Counsel**

Stradley Ronon



September 2006 – December 2011 (5 years 4 months) | Greater Philadelphia Area

I practiced in patent, trademark, copyright and trade secret matters, mainly representing chemical, medical device, pharmaceutical, and biotechnology clients in both intellectual property transactional and litigation matters. I also have expertise in social media issues as they relate to clients and attorneys.

▾ 7 recommendations, including:



**Ray Mannion**
Vice President of Operations at PuriCore

I have worked with Kim for several years now on domestic and international IP matters. She has also worked with me and... View ↓

**Rachel Hamilton**
Senior Industry Consultant at American …

It was a pleasure to have Kim Jessum as a speaker for our "Pharma & Biotech Patent, Claim Drafting & Prosecution"... View ↓

5 more recommendations ↓

**Member, Corporate Leadership Committee**

The Philadelphia Zoo

March 2008 – June 2011 (3 years 4 months)

**Counsel**

Rohm and Haas Company



2004 – 2006 (2 years)

▾ 3 recommendations, including:



**Rob Lindefjeld**
General Counsel and Chief IP Counsel …

Kim is a very professional lawyer and devotes all of her energies to the particular task at hand. I am proud to work with... View ↓



**Tifani Edwards**
Senior Patent Counsel at Dow Advance…

Kim was a pleasure to work with. She is focused and determined and a very competent attorney. It is amazing to witness how... View ↓

1 more recommendation ↓

**Associate**

Morgan Lewis & Bockius



2000 – 2004 (4 years)

▾ 1 recommendation



**James Elam**
Producer at Eternal Crescent Media

Kim is an amazing woman who is at the same time personable and smart. I enjoyed working with her greatly. View ↓

**Associate**

Schnader Harrison

1998 – 2000 (2 years)   010

**Legal Intern**

Kim Jessum | LinkedIn



Sidley Austin
May 1996 – May 1997 (1 year 1 month)

**Process Design Engineer**
Foster Wheeler
March 1992 – August 1994 (2 years 6 months)

### Skills & Expertise

Most endorsed for...

| 96 | Intellectual Property |
| 39 | Patents |
| 29 | Licensing |
| 26 | Litigation |
| 19 | Trademarks |
| 13 | Legal Writing |
| 12 | Patent Prosecution |
| 11 | Trade Secrets |
| 9 | Copyright Law |
| 8 | Commercial Litigation |

Kim also knows about...

| 7 | Patent Litigation | 7 | Legal Research | 6 | Corporate Law | 6 | Civil Litigation |
| 4 | Due Diligence | 3 | Corporate Governance | 3 | Joint Ventures | 3 | Patentability |
| 2 | Contract Negotiation | 1 | Technology Transfer | 1 | Mergers |

### Publications

**Going Green**
The Philadelphia Lawyer
June 21, 2010

3 authors

**Kim Jessum**
Associate General Counsel at Heraeus I…

**Michael Hayes**
Partner, Litigation Department, Montgo…

Sophia Lee

011

Kim Jessum | LinkedIn

**A Toast to Proposed Changes in the Pennsylvania Liquor Control System**
The Philadelphia Lawyer
March 2011

From the Editor column in Spring Issue

**Trying Is: Relearning to Persevere**
The Philadelphia Lawyer
September 2010

 Education

**University of Pennsylvania**
Masters, Biopharmaceuticals
2000 – 2004

**Chicago-Kent College of Law, Illinois Institute of Technology**
JD, Law, Intellectual Property Law
1994 – 1997

Activities and Societies: Treasurer, Student Bar Associaton

**Lehigh University**
BS, Chemical Engineering
1988 – 1992

**Rutgers, The State University of New Jersey-New Brunswick**
Engineering
1987 – 1988

**Plymouth Whitemarsh High School**
1983 – 1987

 Honors & Awards

2011 Patent Buddy Top Patent Prosecutor, ABA Fellow, 2010, 2011 & 2012 Pennsylvania Super Lawyers, 2007 Outstanding Service Award for ABA Litigation Section, 2006 & 2007 Super Lawyers Rising Star, ABA Young Lawyers Division 2005 Star of the Quarter, American Lawyer Media 2003 Lawyer on the Fast Track, Morgan Lewis 2001 Pro Bono Award

 Organizations

American Bar Association (ABA) Intellectual Property Law Section, ABA Litigation Section Distance CLE Committee, ABA Standing Committee on Technology and Information Systems

012

# EXHIBIT 12

## Arnold I. Kalman

| | |
|---|---|
| **From:** | Morgan Nickerson <Morgan.Nickerson@nelsonmullins.com> |
| **Sent:** | Tuesday, March 05, 2013 8:54 PM |
| **To:** | Max Moskowitz (MMoskowitz@ostrolenk.com); MCONNOLLY@MURTHALAW.COM; arnoldkalman@arnoldkalmanlaw.com |
| **Cc:** | Chris Finnerty |
| **Subject:** | FW: 2 subpoenas served on Heraeus NY |
| **Attachments:** | Subpoenas served on Heraeus 3.4.13 (01433190).PDF |
| | |
| **Importance:** | High |

I have been retained to represent Heraeus Kulzer GmbH and Heraeus Metals NY LLC for the purposes of defending them against the attached subpoenas that you just served on me today at 4:30. I am troubled to learn that you have been harassing my clients with multiple phone calls all day yesterday and today regarding the subpoena. Your contacting of my client is to stop immediately. It is obvious that you served the subpoena and then violated the rules of civil procedure by waiting over 24 hours to serve it on me for the sole purpose of having an opportunity to harass my client. If I learn of any improper contact with my client or further failure to serve documents in a timely manner as mandated by the rules of civil procedure, I will not hesitate to seek an order from the Court to put an end to your improper litigation tactics and to revoke the pro hac status that has been granted in this case.

**Morgan T. Nickerson | Nelson Mullins Riley & Scarborough LLP**
(e) morgan.nickerson@nelsonmullins.com | (p) 617.573.4725 | (f) 617.573.4754

---

**From:** Max Moskowitz [mailto:MMoskowitz@ostrolenk.com]
**Sent:** Tuesday, March 05, 2013 4:32 PM
**To:** Morgan Nickerson; MCONNOLLY@MURTHALAW.COM; Max Moskowitz
**Subject:** FW: 2 subpoenas served on Heraeus NY


Morgan:

Please see attached two subpoenas served as noted.

Max

Confidentiality Notice

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure.

If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

To ensure compliance with the requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including the attachments) is not intended or written to be used, for the purpose of (a) avoiding penalties under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or tax-related matter[s]. To provide you with a communication

that could be used to avoid penalties under the Internal Revenue Code will necessarily entail additional investigations, analysis and conclusions on our part.

| **From:** | Max Moskowitz <MMoskowitz@ostrolenk.com> |
| --- | --- |
| **Sent:** | Friday, March 15, 2013 4:43 PM |
| **To:** | Morgan Nickerson; Max Moskowitz |
| **Cc:** | Chris Finnerty; MCONNOLLY@MURTHALAW.COM |
| **Subject:** | RE: Heraeus v. Omni deposition dates |

Morgan:

Agreed.

We disagree with your stance re Heraeus GmbH, and reserve our rights to remedy the refusal to appear.

Please be here promptly at 1:00 PM on Tuesday,  to allow his depositions to be completed.

Otherwise, we shall proceed as below.

See you,

Max

---

**From:** Morgan Nickerson [mailto:Morgan.Nickerson@nelsonmullins.com]
**Sent:** Friday, March 15, 2013 4:27 PM
**To:** Max Moskowitz
**Cc:** Chris Finnerty; MCONNOLLY@MURTHALAW.COM
**Subject:** RE: Heraeus v. Omni deposition dates

Max,

We will make Romero available at your office in New York at 1 pm on Tuesday.  Also, we will make Holden, as my client's 30(b)(6) witness, available at 9:30am Thursday in Boston.  It is our position that Heraeus GmbH has not been properly served a subpoena and, as a result, it will not be attending your improperly notice deposition.  Similarly, and for the reasons stated below, we will not be making a witness available from Heraeus Metals given their complete lack of information related to this case.   Accordingly, as there will be no witnesses attending, there is no need to hold any deposition at 9am Tuesday.   Lastly, we intend to take your client's 30(b)(6) deposition as noticed on Wednesday 3/20/13 at 10:30 a.m. at Cozen & O'Connor, 277 Park Ave. 20th Floor, NYC

We will see you Tuesday at 1pm.

Morgan

**Morgan T. Nickerson | Nelson Mullins Riley & Scarborough LLP**
(e) morgan.nickerson@nelsonmullins.com | (p) 617.573.4725 | (f) 617.573.4754

# Exhibit 13

# Filed Under Seal

01308558.1